Mark **BOOHER**, Defendant–Appellant,

v.

**STATE of Indiana, Plaintiff–Appellee.**

No. 49S00–0007–CR–441.

Supreme Court of Indiana.

Aug. 20, 2002.

---

J. Richard Kiefer, James J. Bell, Andrew J. Borland, Kiefer & McGoff, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Joseph A. Samreta, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

DICKSON, Justice.

The defendant, Mark Booher, was convicted of robbery as a class B felony and for the January 1999 murder of Timothy Laflen in Indianapolis. The defendant's appeal asserts that the State failed to disclose favorable exculpatory evidence, that the State engaged in misconduct by presenting and arguing a baseless and prejudicial theory, and that the trial court erred in sentencing him for robbery as a class B felony. We affirm.

### Failure to Disclose Exculpatory Evidence

■ The defendant contends that the trial court erred in denying his motion to correct error which sought a new trial on grounds that the State suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant claims the State suppressed police notes of an interview with Brian Marrs, the victim's neighbor, specifically notes reflecting that Marrs told police that he had seen Laflen alive at a time later than the defendant's last opportunity to commit the murder.

At a hearing held on the defendant's motion to correct error, Marrs testified that, to the best of his knowledge, he had told police that he had seen Laflen alive and alone some time between 1:30 and 3:00 p.m. on the day of the murder. Record at 1653–54, 1656. Marrs qualified his time estimates, noting that "I really didn't pay much attention because I don't wear a watch generally," Record at 1654, and "I usually don't keep track of the time." Record at 1656. Marrs further testified that all three police officers interviewing him were writing down short notes during the interview. The officers testified that Marrs did not tell them that he had seen Laflen between 1:30 and 3:00 p.m. The only known police notes of the interview recorded only Marrs's name, gender, race, age, date of birth, social security number, address, and telephone. The State disclosed to the defense the name, address, and telephone number of Marrs, but provided no statements or interview notes. Marrs also testified during the hearing that the defendant's trial counsel contacted him before trial, and that Marrs had also informed defense counsel regarding the last time Marrs saw Laflen, although defense counsel denied being so informed.

■ In denying the motion to correct errors, the trial court found that "Brian Marrs's recollection of what he told police officers and defense counsel, contradicts the recollection of the police detectives and that of defense counsel, and the Court therefore questions the accuracy of Mr.

Marrs['s] memory of events" and that "the evidence presented by Brian Marrs ... does not rise to the level of evidence that would have changed the outcome of the trial." Record at 299. When ruling on a Motion to Correct Errors, the trial court sits as the initial fact finder on the issues raised, and we review the trial court's determination for an abuse of discretion. *Sanchez v. State*, 675 N.E.2d 306, 310 (Ind. 1996). The defendant has failed to demonstrate an abuse of discretion. We decline to find error in the trial court's denial of the defendant's motion to correct error.

### Prosecutorial Misconduct

The defendant contends that the prosecutor committed misconduct by presenting a prejudicial motive for the killing that was not supported by the evidence or by any good faith basis. The State's theory of the defendant's motive (that Laflen was gay, and that Booher killed Laflen when Laflen terminated their homosexual relationship) was initially disclosed to the trial court and the defense before trial. The defendant now asserts that the State's implications that he was a homosexual, which occurred both during his cross-examination by the State and during the State's closing argument, lacked evidentiary support and were unethical, unfairly prejudicial, and placed him in grave peril.

■ The State correctly points out that the defense did not object to its cross-examination of Booher regarding his sexual preferences, nor did the defendant object during the prosecutor's closing argument.[1] A party's failure to present a contemporaneous trial objection asserting prosecutorial misconduct precludes appellate review of the claim. *Johnson v. State*, 725 N.E.2d 864, 867 (Ind.2000). Such default may be avoided if the prosecutorial misconduct amounts to fundamental error. For prosecutorial misconduct to constitute fundamental error, it must "make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process [and] present an undeniable and substantial potential for harm." *Benson v. State*, 762 N.E.2d 748, 756 (Ind.2002); *see also Mitchell v. State*, 726 N.E.2d 1228, 1236 (Ind.2000). The defendant argues that the standard of review for prosecutorial misconduct is the same regardless of whether fundamental error is alleged.

■ In reviewing a properly preserved claim of prosecutorial misconduct, we would "determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected." *Coleman v. State*, 750 N.E.2d 370, 374 (Ind.2001). The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* It is true that this Court has previously expressed a similar standard for the review of prosecutorial misconduct claims presented as fundamental error. *See, e.g., Roach v. State*, 695 N.E.2d 934, 942 (Ind. 1998) (a defendant must show that the

---

1. The defendant did object on relevance grounds when another witness was asked how he felt when he learned of the victim's death. Record at 721. At the colloquy at the bench that followed, the State argued the question was relevant to show the pattern of relationships between the victim and his intimate male friends. The defendant argued that there was no evidence that he was intimate with the victim. The trial court allowed the witness to answer the question. This one objection asserting relevance to the admission of evidence not challenged on appeal is insufficient to preserve the claim presently asserted on appeal.

conduct placed the defendant in grave peril and " 'had a probable persuasive effect on the jury's decision.' " (quoting *Carter v. State*, 686 N.E.2d 1254, 1262 (Ind.1997)); *see also Miller v. State*, 623 N.E.2d 403, 408 (Ind.1993); *Scherer v. State*, 563 N.E.2d 584, 586 (Ind.1990). For authority, these cases directly or indirectly and ultimately rest on *Maldonado v. State*, 265 Ind. 492, 498–99, 355 N.E.2d 843, 848 (1976).

In *Maldonado,* this Court noted that the defendant did not present a timely objection to several of the instances of alleged prosecutorial misconduct claimed on appeal. Writing for the Court, Justice DeBruler expresses our preference "to decide issues on their merits, and not to erect procedural obstacles to their presentation," but notes that "a prompt objection affords the trial court an opportunity to prevent or remedy prejudice to a defendant without the considerable waste of time and resources involved in a reversal of a conviction." *Id.* at 498, 355 N.E.2d at 848. The *Maldonado* opinion then proceeds to analyze the merits of the prosecutorial misconduct claims, but without any further reference to fundamental error. We therefore understand *Maldonado* to articulate the standard for reviewing claims of prosecutorial misconduct in the absence of procedural default and a claim of fundamental error. To the extent subsequent cases have interpreted the *Maldonado* standard to express the standard for prosecutorial misconduct as fundamental error, we believe that they misconstrue *Maldonado.*

■ We hold that an appellate claim of prosecutorial misconduct presented on appeal in the absence of contemporaneous trial objection will not succeed unless the defendant establishes not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error.

■ While no direct evidence was presented of a homosexual relationship between the victim and the defendant, the State did present evidence showing a pattern in Laflen's gay relationships with a succession of male friends that included sexual intimacy. One of the several men with whom Laflen was sexually intimate during the period immediately preceding his death testified that Laflen had talked with him regarding having problems with two other men. One of these men later testified that he had been in a sexually intimate relationship with Laflen. The other man was named "Mark," the defendant's first name (and whose last name the witness thought that Laflen pronounced as "Brewer"), who had often telephoned Laflen.

On January 8, 1999, Booher told his girlfriend, Julia Allison–Hamilton, and her parents that he was going to get $4000 the next day from his friend to pay bills and purchase furniture and appliances for his home. Booher left early the next morning, January 9, driving Julia's vehicle. Later that morning, he called Julia from a cellular telephone and told her that he had gotten most of the money. When he did not arrive home when expected, Julia and her parents left the house to go to a restaurant and do shopping. Julia was eventually able to again contact Booher by telephone, and he told her, "I might have to ditch your car," but did not discuss any details. Record at 415. Julia told him not to ditch the car, and Booher stated that he would be home soon. When Julia returned home, Booher was in the shower and Julia noticed that he had returned with a different sweatshirt than the one he was wearing when he left that morning. Booher explained to her that he and Laflen had been attacked outside Laflen's home by robbers and that Laflen might be dead. The robbers made them lay face

down in the snow, taking their money and valuables. The robbers then ordered them into Laflen's house where the robbers allowed him to change out of his dirty sweatshirt into a sweatshirt from Laflen's bedroom. Booher saw Laflen bleeding from the head, and the robbers then shoved Laflen into a car and left Booher alone at the house. Booher told her that he couldn't call the police because "they would of thought that I did something wrong." Record at 444. Julia inspected Booher's pants and found them wet only from the knee down.

Later that day, and during the next few days, Booher used Laflen's checkbook to purchase many items and to obtain cash, and asked Julia to sign Laflen's name to one of the checks to make a purchase. During that same time, Booher gave Julia a man's ring with diamonds on it for her to pawn for money. According to Laflen's friends, he was never seen without the ring on his finger. Laflen's body was found outside his home on January 12, 1999, covered by snow. He died of multiple stab wounds. In the evening of Wednesday, January 13, Booher learned that the police wanted to talk with him, and the next day he and Julia left Indiana for Washington D.C.

Booher testified for the defense at trial. On direct examination he denied killing Laflen, denied robbing him, and denied having any type of sexual relationship with him. Booher testified that after leaving home early on January 9th, he was with another woman to whom he loaned his sweatshirt, thereafter wearing Laflen's sweatshirt to conceal the scent of the woman's perfume on his own sweatshirt from Julia. He claimed that he fabricated the story about being robbed to prevent Julia from discovering his being with another woman. Booher asserted that Laflen owed him money and that,

when Laflen was unable to immediately pay Booher the money owed, Laflen gave Booher a black satchel with Laflen's checkbook and personal items in it as security. Booher admitted pretending to be Laflen and calling Western Union to get a cash advance. On cross-examination, Booher stated that the money allegedly owed him from Laflen was from one incident of Booher selling a large quantity of marijuana to Laflen. Booher said that the man's ring he gave to Julia to sell was one he found in Laflen's satchel. Booher admitted knowing Laflen for ten or eleven months and having visited his home three or four times, but denied having a homosexual affair with Laflen and asserted that he was not a homosexual. The cross-examination regarding a sexual relationship between Booher and Laflen had been raised on direct examination and was also reasonable in light of the evidence of Laflen's numerous gay relationships and Booher's frequency of contact with Laflen.

During closing argument, the State discussed the various items of inculpatory evidence presented at trial and addressed the explanations asserted during the defendant's testimony. The State also pointed out that Booher and Laflen frequently spent time together and often talked on the telephone; that Laflen associated with "generally friends and lovers;" and that "when Mr. Laflen tells Mr. Booher that he didn't want anything more to do with him," the defendant decided "no, I'm not gonna have that" and "[s]o he killed Mr. Laflen." Record at 1545. While there was no direct evidence proving that Laflen and Booher were engaged in a homosexual relationship, the State's argument was a reasonable inference based on the evidence presented at trial.

Considering the nature and extent of the evidence, we find that the defendant's claims of prosecutorial misconduct

in this case do not constitute fundamental error, if error at all. The State's direct or implied assertions during its cross-examination of Booher and during closing argument that Booher had been Laflen's homosexual partner did not make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. The State's actions do not present an undeniable and substantial potential for unfair harm.

## Evidentiary Harpoon

■ The defendant contends that the prosecutor acted improperly and deliberately to prejudice the jury during the State's questioning of a witness. The defendant asks this Court to reverse his conviction "to prevent the State from profiting from such a deliberate and inexcusable harpoon." Br. of Appellant at 34. The defendant contends that the following exchange between the prosecutor and the defendant's girlfriend constituted an evidentiary harpoon:

Q. Okay. Now before the two of you moved together did you talk about his background? Who he was, his family?
A. Yeah. He told me about his background. Ah—he told me [sic] had done time and told me it was in his past.
Q. Okay. And, ah—what type of—when you say he did time, what did he say he did?

Record at 404. The defense then requested a bench conference and moved for a mistrial on grounds that the witness "brought up the fact that my client had a criminal history." Record at 405. The trial court responded:

[Defense counsel], the question that the prosecutor asked was, did he tell you about his background. And so maybe the witness didn't understand. But, State, you can't ask that question, what did he tell you about his criminal histo-

ry. I'm going to deny the mistrial. If you want to make a better record when we take a break you can. But I'm going to deny the mistrial. Do you want a curative instruction? Do you want me to instruct the jury that they're not to, ah—that I'm going to strike the last answer?

Record at 405–06. The defense declined the offer of a jury admonishment.

Because of this refusal of the trial court's offer to admonish the jury, the defendant may not assert an appellate claim of error in the denial of his motion for mistrial. *Randolph v. State*, 755 N.E.2d 572, 575 (Ind.2001).

■ Moreover, even if the claim had not been forfeited, to succeed on appeal from the denial of a mistrial, a defendant must demonstrate that the conduct complained of was both error and had a probable persuasive effect on the jury's decision. *Pierce v. State*, 761 N.E.2d 821, 825 (Ind. 2002); *Jackson v. State*, 728 N.E.2d 147, 151 (Ind.2000). The decision to grant or deny a motion for a mistrial lies within the discretion of the trial court. *Pierce*, 761 N.E.2d at 825; *Heavrin v. State*, 675 N.E.2d 1075, 1083 (Ind.1996). A mistrial is an extreme remedy granted only when no other method can rectify the situation. *Id.* Because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury, the trial court's determination of whether to grant a mistrial is afforded great deference on appeal. *Schlomer v. State*, 580 N.E.2d 950, 955 (Ind.1991).

■ While the reference that the defendant had spent time in prison was prejudicial, we find the probable persuasive effect on the jury to be minimal. Booher testified that he sold ten pounds of marijuana to Laflen, that he was wanted for jumping bond on a DUI charge against

him; and that he forged Laflen's name on checks. Considered with these admissions of other criminal conduct, the challenged witness statement that the defendant had "done time" was unlikely to have any probable persuasive effect on the jury's decision. We thus find not only procedural default but also no abuse of discretion in the denial of the defendant's motion for mistrial.[2]

### Jury Instructions

The defendant contends that the trial court gave incorrect and inconsistent instructions as to robbery as a class A felony, and thus that his conviction for robbery as a class B felony should be vacated. Asserting that Preliminary Instruction No. 6 and Final Instruction No. 24 presented erroneous and inconsistent definitions of robbery as a class A felony, the defendant argues that it is impossible to ascertain whether the jury unanimously found the element necessary for the class A enhancement. He also contends that a conviction for robbery as a class B felony would violate state double jeopardy considerations. If this case is not remanded for new trial on other grounds, the defendant seeks reduction of his conviction for robbery from a class B to a class C felony.

At trial, the jury found the defendant guilty on Count 1, murder; Count 2, felony murder; and Count 3, robbery as a class A felony. At sentencing the trial court vacated the count charging felony murder and reduced the robbery from a class A to a class B felony. The court entered a judgment of conviction for murder and for robbery as a class B felony. The applicable statute defining robbery states:

A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) By using or threatening the use of force on any person; or

(2) By putting any person in fear;

commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and a Class A felony if it results in serious bodily injury to any person other than a defendant.

Ind.Code § 35–42–5–1. The trial court gave Preliminary Instruction No. 6, which purported to provide the general statutory definition of the offense. It stated in part that robbery "is a Class A felony if it is committed while armed with a deadly weapon *or* results in bodily injury to any person other than a defendant." Record at 125 (emphasis added). The instruction further contained an enumeration of the specific elements required to convict this defendant on the charge of robbery as a class A felony, stating that the State must prove each of the following elements:

The Defendant, Mark Booher, on or about January 9, 1999,

1) did knowingly,

2) while armed with a deadly weapon, that is: a knife,

3) take from the person or presence of Timothy Laflen, property, that is: Jewelry, Clothing, and Personal Checks,

4) by putting Timothy Laflen in fear or by using or threatening the use of force on Timothy Laflen, which resulted in *serious* bodily injury, that is: stab wounds of the head and body, to Timothy Laflen;

---

2. The defendant also argues that "the cumulative effect of the numerous instances of misconduct" prejudiced Booher to the extent that he could not receive a fair trial. Br. of Appellant at 38. We decline to find merit in this argument.

If the State did prove each of these elements beyond a reasonable doubt, you should find the Defendant, Mark Booher, guilty of Robbery, a Class A Felony, as charged in Count III of the Information.

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant, Mark Booher, not guilty of Robbery, a Class A Felony, as charged in Count III of the Information. .

Record at 125–26 (emphasis added). At the conclusion of the evidence and closing arguments, the trial court directed the jury to keep the preliminary instructions in mind and to consider them along with the final instructions. Record at 144. In addition, Final Instruction No. 24 was also given which duplicated Preliminary Instruction No. 6, except that Final Instruction No. 24 correctly included the additional word "serious" before "bodily injury" in the introductory definition of robbery as a class A felony. Both instructions contained the same enumeration of the elements required to convict in this case. Record at 150–51.

The defendant argues that the definition paragraph of Preliminary Instruction No. 6 authorized the jury to find him guilty of robbery as a class A felony without finding that the robbery resulted in *serious* bodily injury. He also argues that the definition section of both Preliminary Instruction No. 6 and Final Instruction No. 24 inaccurately quoted the statute by inserting the phrase "if it is committed while armed with a deadly weapon or" before "results in serious bodily injury." He contends that this error thus erroneously permitted the jury to find the robbery as a class A felony "if it is committed with a deadly weapon" instead of requiring

the jury to find that it resulted in serious bodily injury. Record at 125, 150.

The State contends that the defendant invited any error associated with the class B felony robbery conviction. During the sentencing proceedings, the defense asserted that, as to Count 3 charging robbery, "because the way it was charged, I believe in this case was resulting in serious bodily injury, death, which was an element of the murder as well." Record at 1632. When the trial court suggested that it "reduce the robbery to the B," *id.*, the defense responded, "The court could reduce that to—from an A felony to a B felony in that case." Record at 1633. " 'A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error.' " *Ellis v. State,* 707 N.E.2d 797, 803 (Ind.1999)(quoting *Kingery v. State,* 659 N.E.2d 490, 494 (Ind.1995)). Having requested the trial court to enter the robbery conviction as a class B felony, the defendant may not assert this as error on appeal.

Furthermore, we observe that both Preliminary Instruction No. 6 and Final Instruction No. 24, even though inconsistent with respect to their language stating the statutory definition of the robbery as a class A felony, both included an identical section that separately enumerated the specific elements, each of which the instruction stated the State had to prove in order to convict Booher of the charge of robbery as a class A felony in this case. These separately enumerated elements included both "while armed with a deadly weapon, that is: a knife," and "which resulted in serious bodily injury, that is, stab wounds of the head and body, to Timothy Laflen."[3] Record at 126, 156. Because

---

**3.** The inclusion of the "while armed with a deadly weapon" is not a necessary element of the offense of robbery as a class A felony. For robbery to become a class A felony, it is

the jury returned a guilty verdict on this count, we are assured that the jury found proven beyond a reasonable doubt that the robbery was committed while armed with a deadly weapon, thus constituting robbery as a class B felony. Ind.Code § 35–42–5–1.

The defendant further argues that, because the two challenged instructions erroneously used the disjunctive language from the general statutory definition of the class B felony (*either* armed with a deadly weapon *or* resulting in bodily injury), it is possible that the prerequisite finding for the class B felony may have derived from the jury's finding of "results in bodily injury" rather than "while armed with a deadly weapon." Looking only to this language, the defendant's conviction for murder would be based on the same harm that forms the basis of the class B robbery conviction, contrary to our rules of statutory construction and common law principles recognized in *Pierce v. State*, 761 N.E.2d 826, 830 (Ind.2002); *see Richardson v. State*, 717 N.E.2d 32, 56 (Ind.1999) (Sullivan, J., concurring). As discussed above, the jury's verdict of guilt is reliably based on the enumerated elements portion of each instruction, not their respective general definition paragraphs. Because these enumerated elements separately included "while armed with a deadly weapon," we are convinced that the reduction of robbery from a class A felony to a class B felony was thus supported by the jury's determination of guilt in accordance with the enumerated elements listed in the instructions. His conviction of robbery as a class B felony is thus not based upon the "serious bodily injury element" upon which the defendant bases his double jeopardy argument.

only necessary for the State to prove that "it results in serious bodily injury to any person

## Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.