Stephen K. SHERWOOD, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 55A01–0110–CR–402.

Court of Appeals of Indiana.

Feb. 26, 2003.

Timothy W. Oakes, Eric K. Koselke, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Stephen K. Sherwood appeals his conviction, after a jury trial, for the murder of four year-old Hope James and his sentence thereon.

We affirm.

### ISSUES

1. Whether the trial court erred when it denied Sherwood's motion for a mistrial after five jurors had observed him in jail garb.

2. Whether sufficient evidence supports the conviction.

3. Whether Sherwood's sentence of sixty-five years imprisonment is inappropriate.

### FACTS

Sherwood met Alice Barrett in July of 1995 in Connersville, where they were both living at the time. Barrett had a daughter, Hope James—a normal, healthy four year-old who was not subject to unusual bruises or injuries. Within several weeks, Sherwood was living with Barrett and Hope. On September 18, 1995, Barrett left Hope in Sherwood's care, and he told her that he spanked Hope and left a handprint. A few days later, Barrett saw Hope's "whole buttocks was a bruise." (Tr. 248). Barrett confronted Sherwood, and he "said he didn't mean to do it" and "that he didn't know that he had hit her that hard." (Tr. 247). On September 20, Sherwood told Barrett that Hope "had been running and bumped her head" and vomited. (Tr. 249).

Hope told her mother Sherwood had pushed her face in the vomit.

When Hope's grandmother saw her bruised buttocks on September 22, she took Hope to the Fayette County Sheriff's Department, where pictures were taken and a report was filed. Subsequently, Barrett called her brother to tell him she was pressing charges against Sherwood about the injuries to Hope. Then, Barrett went to sleep with Hope at her side in the bed. Barrett awoke to find Sherwood atop her with a knife. Sherwood said he had heard about the charges. Barrett screamed, and Sherwood told her to stop or he would kill her and Hope. Sherwood asked Hope whether he had whipped her with a belt; "she said, 'Yes,' and ... he called her a f_____ liar" and pointed the knife at her.' (Tr. 255).

Barrett reported the incident to the Connersville police later that morning, September 23, 1995. After learning about this incident, the Sheriff's Department sought charges against Sherwood for two counts of criminal confinement with a deadly weapon and one count of criminal trespass, as well as for the earlier beating of Hope.

Barrett took Hope away from Connersville, but she later returned and reconciled with Sherwood. On October 6, the Sheriff's Department informed Barrett that an arrest warrant had been issued for Sherwood. Barrett said she did not know his whereabouts. Barrett then told Sherwood about the warrant and, taking Hope along, went with him to Martinsville, where they all stayed at the Hillview Motel.

On Friday, October 13, Barrett began work as a waitress at the Waffle House, leaving Hope in Sherwood's care. Several hours later, Sherwood came in the Waffle House carrying Hope—who had a cut lip. Sherwood said that a deer had run in front

of his truck, and when he slammed on the brakes, Hope hit the dashboard and a box of tools fell on her. The next morning, Barrett saw bruises "all across" Hope's back "and on her legs," a black eye, and "a popped blood vessel in" one or both ears. (Tr. 268).

On Saturday, October 14, when Hope was again in Sherwood's care, Barrett came home from work and observed that Hope's lip "was swollen real, real bad." (Tr. 270). She asked Sherwood what happened; he said that Hope had been outside the bathroom door while he was inside, and when he "opened the door to come back out . . . that the door hit her in the mouth." (Tr. 271).

Sherwood was hired at Matchless Machines and began working the day shift on Monday, October 16. That week, Hope's bruises faded, and she seemed to be fine. On Saturday, October 21, Barrett spent the day in the motel room with Hope. Hope said that her head hurt a little and her stomach was upset, but her mother didn't worry because "she wasn't acting sick." (Tr. 276). Sherwood worked from 7 a.m. to 11 a.m. at Matchless. Sherwood said "several times" to coworkers that he "was wanting to go out and get drunk and really beat . . . somebody up." (Tr. 439). That afternoon, Sherwood "got upset" because a check he was expecting had not arrived, and he insisted that Barrett go to work because they needed the money. (Tr. 277).

Barrett went to work about 6:00 p.m. About an hour later, Sherwood called to say that Hope "like passed out" and was hot. (Tr. 278). Barrett told him to check her temperature, to watch her, and to call back if she continued to be sick. Shortly thereafter, Sherwood called again and reported that Hope was feeling better. La-

ter, when her work slowed, Barrett called Sherwood and asked that he put Hope "in bed with him so he could watch her." [1] (Tr. 283–84).

Barrett arrived home at the motel a little after 1:00 a.m. When she turned on the light, only Hope's foot was visible outside the covers. She pulled the cover from over Hope's face, saw that Hope "was blue," and "started screaming." (Tr. 284). Sherwood "woke up," and said, "What's the matter?" and "She's okay." (Tr. 284). Sherwood told Barrett to "stop the yelling" or "he would slap [her]." (Tr. 285). Barrett called 911 and reported "that [Hope] was blue." (Tr. 285). Sherwood told Barrett to go outside.

The guest in the adjacent motel room heard Barrett repeatedly scream, "Oh my God. You've killed her. Why didn't you stop?" (Tr. 337). She heard a male voice respond, "Shut up." (Tr. 337). Several guests emerged from their rooms into the parking lot, and upon hearing about Hope, three tried unsuccessfully to resuscitate her using CPR. When the ambulance arrived sixteen minutes after the 911 call, the emergency personnel found Hope "cold, [a] little bit blue, not breathing, and she did not have a pulse." (Tr. 426). Their resuscitative efforts were also to no avail.

On October 22, 1995, forensic pathologist Dr. Dean Hawley performed an autopsy on Hope. She was thirty-eight inches tall and weighed twenty-eight pounds. She had suffered a number of blunt force injuries to her head, neck, abdomen, back, and lower legs. Eight injuries to her head "occurred at or about the time of death," inflicted "considerable internal damage" to her brain, and evidenced the application of "a significant amount of force." (Tr. 604). According to Dr. Hawley, any one of those

---

**1.** Hope usually slept on a pallet on the floor of the room.

injuries could have resulted in her death. Further, he found those injuries consistent with her head having been struck against a cinder block wall. Dr. Hawley found numerous other "older" injuries on Hope but determined that her head injuries were "fresh" and could not have been inflicted days before her death. (Tr. 606, 605). Dr. Hawley also found two "fresh" injuries on Hope's back, "created, like the head injuries, by an impact of the body with a surface that does not puncture skin" and bearing "stamped in" abrasions on her back. (Tr. 612, 611). The injuries went "deep into the muscles ... right down to the bone of the spine itself." (Tr. 612). Further, the "stamped in" abrasions were hexagonal in shape, with a 5/16 inch diameter. When compared to photographs of bolts in the cinder block wall of Sherwood's motel room, which bolts were of that shape and diameter, Dr. Hawley determined that the injuries were "consistent" with Hope's "back being slammed into the cinder block wall" of Sherwood's motel room. (Tr. 614).

Sherwood was charged with murder, and the State sought a sentence of life without parole. Trial took place in July of 2001.[2] The foregoing facts were adduced. Further, the jury saw the pictures taken of Hope's horrendous bruise injuries of September 1995, as well as numerous photographs of the injuries on her body at the time of her death a month later. Dr. Hawley reviewed the pictures taken of Hope's buttocks area on September 22, 1995, and opined that those injuries had not been inflicted with an open hand but "by the application of an object," specifically, "an object that folds across the skin's surface creating an abrasion and a line that wraps around the body contours." (Tr. 617, 618). He further stated that the amount of force applied was "severe" and that Hope had suffered "a rather severe beating." (Tr. 618).

A guest at the motel testified that he had walked by Sherwood's room that evening and heard a child crying inside. Four different witnesses testified that Sherwood's demeanor after Barrett had called 911 about Hope was as follows: (1) "rather calm" and he "didn't seem quite upset," (2) "extremely calm," (3) "pretty calm," and (4) showed no concern, with his not wanting to assist with CPR. (Tr. 420, 422, 348, 454, 399, 400). Finally, the jury heard that the doorknob on the bathroom door in the motel room was positioned forty inches from the floor, which contradicted Sherwood's account of the doorknob accidentally striking Hope in the mouth when he opened it.

The jury heard Sherwood's taped statement to police shortly after Hope's death, as well as his testimony. According to Sherwood, after Barrett went to work, Hope lay down on her pallet on the floor and went to sleep; he heard her gasp twice, tried and was unable to wake her, put her in a cold shower, and then rubbed her with ice—after which she seemed to be alright and went to sleep.

The jury found that Sherwood was guilty of murder. In the second phase of the trial, the State argued that Sherwood should be sentenced to life without parole.[3] The jury recommended that Sherwood not be sentenced to life without parole. At the subsequent sentencing hearing, the trial

---

**2.** Sherwood's conviction after a jury trial in 1997 was reversed in *Sherwood v. State,* 717 N.E.2d 131 (Ind.1999), which remanded the action for a new trial.

**3.** The State asked the jury to recommend that Sherwood be so sentenced based upon the statutory aggravating factor that "the victim of the murder was less than twelve (12) years of age." IND.CODE § 35–50–2–9(b)(12).

court ordered Sherwood to serve sixty-five years.

## DECISION

### 1. *Mistrial*

■■■ The decision to grant or deny a motion for a mistrial lies within the discretion of the trial court. *Booher v. State,* 773 N.E.2d 814, 820 (Ind.2002). A mistrial is an extreme remedy granted only when no other method can rectify the situation. *Id.* On appeal, the trial court's determination of whether to grant a mistrial is afforded great deference because "the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury." *Id.* Further, in order to prevail on the appeal from the denial of a mistrial, "the defendant must demonstrate that the conduct complained of was both error and had a probable persuasive effect on the jury's decision." *Pierce v. State,* 761 N.E.2d 821, 825 (Ind.2002).

Before the trial reconvened on the third day, Sherwood—dressed in orange jail garb—was seen by some jurors as he was being escorted to court. Sherwood moved for a mistrial, arguing that he would be "unduly prejudice[d]" by the jury having seen him "in handcuffs and shackles and his ... orange jail uniform." (Tr. 532, 531). The trial court declared that it would question jurors before ruling on the motion. It then asked whether any jurors had viewed Sherwood "prior to court starting this morning?" (Tr. 533). The five who indicated that they had seen Sherwood then were questioned individually.

The first such juror told the court he had seen Sherwood wearing a "Sheriff's outfit" but had not observed any handcuffs or shackles on him. (Tr. 534). The next juror said he had seen Sherwood "wearing orange" but saw nothing "else on him." (Tr. 537). The third juror said she had seen Sherwood briefly, but she remembered nothing specific about his appearance. The fourth juror said she had seen Sherwood dressed in the jail uniform. Finally, the fifth juror said that while he was in the hallway, he had seen Sherwood being escorted by two officers and wearing "an orange jumpsuit." (Tr. 543). The five jurors individually averred to the trial court that their decisions on the case would not be affected by what they had seen. The trial court then denied Sherwood's motion.

Sherwood argues that his right to be presumed innocent and his right to a fair trial were violated when the trial court denied his motion for a mistrial after "five jurors observed him in jail clothes, handcuffs, and shackles." Sherwood's Br. at 9.[4] We cannot agree.

First, we observe that our review of the record reveals that no juror reported having observed either handcuffs or shackles on Sherwood. Second, each of the jurors who had seen Sherwood in jail garb told the court, under oath, that he or she would not be affected thereby in deciding the case. Because each juror who saw Sherwood in the jail garb averred that the sight would not affect the decision rendered, Sherwood has not "demonstrated actual harm as a result" of what the jurors had briefly seen. *See Davis v. State,* 770 N.E.2d 319, 326 (Ind.2002). Moreover, because of the jurors' avowed ability to disregard what they had seen, Sherwood has

---

**4.** In his mistrial argument, Sherwood argues only about having been briefly seen in the hallway in an orange jumpsuit by five jurors. Apparently Sherwood wore appropriate civilian clothing in the courtroom during the trial itself, as he acknowledges that "he was not forced to sit throughout the entire trial in jail garb" as was held impermissible in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Sherwood's Br. at 9.

failed to demonstrate that his being seen in jail garb "had a probable persuasive effect on the jury." *See Pierce,* 761 N.E.2d at 825.

Sherwood also directs our attention to a comment by one of the questioned jurors about having seen a deputy escorting other men from the jail to court, and the five jurors having seen him "also being escorted by two deputies." Sherwood's Br. at 10. Our supreme court has noted that ' "reasonable jurors could expect [defendants] to be in police custody while in the hallway of the courthouse." ' *Davis,* 770 N.E.2d at 326 (quoting *Jenkins v. State,* 492 N.E.2d 666, 669 (Ind.1986)). Such a sight does not, *per se,* constitute a demonstration of actual harm to the defendant's constitutional rights. *Id.*

Based on the record before us, we find that the trial court did not abuse its discretion when it denied Sherwood's motion for a mistrial.

### 2. *Sufficient Evidence*

■ Sherwood claims that insufficient evidence supports his conviction because "the circumstantial facts do not clearly and unerringly point to his guilt."[5] Sherwood's Br. at 11. He reminds us that no witness ever *saw* him discipline or strike Hope, denigrates the testimony of Barrett as that of "a troubled drunk," and emphasizes testimony of his own expert witness differing from the conclusions of Dr. Hawley.

■ Our standard of review on his claim, however, is as follows. "In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment, and neither reweighing the evidence nor judging the credibility of the witnesses, we con-

clude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Robertson v. State,* 765 N.E.2d 138, 139 (Ind.2002). Further, a murder conviction may be based wholly upon circumstantial evidence. *Sisk v. State,* 736 N.E.2d 250, 252 (Ind. 2000). And it is for the jury "to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve." *McCarthy v. State,* 749 N.E.2d 528, 538 (Ind.2001). If the testimony believed by the jury "is enough to support the verdict, then the reviewing court should not disturb it." *Id.*

Sherwood was charged with murder, specifically that he knowingly killed Hope, a four year-old child. Thus, the elements which the State was required to prove beyond a reasonable doubt were that Sherwood (1) knowingly (2) killed (3) Hope. *See Burse v. State,* 515 N.E.2d 1383, 1387 (Ind. 1987) (Murder is defined as knowingly or intentionally killing another.) According to the evidence heard by the jury, from about 6:00 p.m. that night until her mother returned from work and found her unresponsive about seven hours later, Hope was alone with Sherwood in a room with a cinder block wall that was studded with hexagonal shaped bolts. Further, according to Dr. Hawley, Hope suffered multiple, severe blunt force injuries to her head and body shortly before her death, and those injuries were consistent with Hope having been repeatedly slammed with great force against the motel room's cinder block wall. This evidence supports the jury's conclusion that it was Sherwood who inflicted the fatal injuries on Hope, *i.e.,* that he knowingly killed her. We will not reweigh the evidence.

### 3. *Sentence*

■ Sherwood next argues that his sixty-five year sentence is manifestly un-

---

**5.** Sherwood cites no authority for his "clearly and unerringly" reference.

reasonable, thus warranting our revision under Indiana Appellate Rule 7(B). Effective January 1, 2003, Appellate Rule 7(B) no longer contains the phrase "manifestly unreasonable." It now provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision," we find "that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B).

▇▇▇▇▇ Generally, sentencing determinations are within the trial court's discretion. *Bonds v. State*, 729 N.E.2d 1002, 1004 (Ind.2000). We review trial court sentencing decisions only for abuse of discretion, including a trial court's decision to increase the presumptive sentence because of aggravating circumstances. *Id.* The presumptive sentence for murder is fifty-five years, and the trial court is authorized to add up to ten years for aggravating circumstances or subtract up to ten years for mitigating circumstances. *See* IND. CODE § 35–50–2–3. If a trial court relies upon aggravating circumstances to enhance the presumptive sentence, "it must (1) identify all significant mitigating and aggravating circumstances; (2) state the specific reason why each circumstance is determined to be mitigating or aggravating; and (3) articulate the court's evaluation and balancing of the circumstances." *Bonds* at 1005.

After the trial court heard evidence and arguments at the sentencing hearing, it found the presence of three aggravating factors and two mitigating factors. First, it cited the "ongoing pattern of physical and mental abuse against" Hope, specifically the evidence of such abuse "prior to the date of the offense in this case." (Tr. 1229). Second, the trial court found as an aggravator that Sherwood "abused a posi-

tion of trust, that is the care of a four year old girl and the trust that she and her family put in him at the time he committed this offense." (Tr. 1230). Third, the trial court found "the age of the victim being less than twelve years of age, that is four years of age," to be an aggravator. (Tr. 1230).[6] The trial court then concluded that two mitigating factors had been shown by the defense: that Sherwood had been "raised in a dysfunctional environment" and that he had suffered past "emotional distress or illness." (Tr. 1230). The trial court then declared that when it "weigh[ed] these aggravators and mitigators," it would sentence Sherwood to "sixty-five years executed." (Tr. 1231).

Sherwood argues that the trial court failed to articulate its evaluation and balancing of those factors it had found to be aggravators and mitigators. However, he directs us to no case where a sentence was reversed on that basis. In *Charlton v. State*, 702 N.E.2d 1045 (Ind.1998), the trial court had described three aggravating circumstances and commented on proffered mitigating circumstances. It then stated its "conclusion" that "after weighing the facts and circumstances," Charlton should serve the presumptive sentence enhanced by an additional five years. 702 N.E.2d at 1052. Our supreme court concluded that even though "the trial court did not articulate specifically that the aggravating circumstances outweighed the mitigating circumstances, it is clear that the trial court did engage in a balancing process" sufficient to sustain the sentence ordered. *Id.*

Sherwood does not challenge the validity of the three aggravating circumstances found by the trial court. Upon review, we find that the three aggravating circumstances found by the trial court are

---

**6.** Sherwood fails to acknowledge this aggravating factor cited by the trial court. The

trial court's statement leaves no doubt that it had indeed found this to be an aggravator.

abundantly clear from the trial court's statement. Moreover, the record provides sufficient evidence sustaining the trial court's conclusion that (1) Sherwood had engaged in a pattern of various abuse against Hope; (2) he had abused his position of trust as to Hope; and (3) Hope was only four years-old when killed by Sherwood. The trial court next proceeded to identify two mitigating circumstances. It then mentioned "weighing these matters out" and said that it "weigh[ed] these aggravators and mitigators" in arriving at the sentence it pronounced. (Tr. 1230, 1231). As in *Charlton*, we believe the record makes it "clear that the trial court did engage in a balancing" process prior to imposition of sentence. 702 N.E.2d at 1052.

We are not persuaded that a sixty-five year sentence for Sherwood's crime is inappropriate. *See* App. R. 7(B).

We affirm.

NAJAM, J., and VAIDIK, J., concur.