**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 24 2012, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW D. ANGLEMEYER**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| DARRYL ANDERSON, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 49A02-1107-CR-601 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patricia J. Gifford, Senior Judge
Cause No. 49G22-1006-FB-43806

**May 24, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

Darryl Anderson appeals his convictions for rape as a class B felony;[1] criminal confinement as a class C felony;[2] and battery as a class A misdemeanor.[3]

We affirm.

ISSUE

Whether the prosecutor committed misconduct.

FACTS

A.M., an adult with the mental and learning capacity of a sixth-grader, met Anderson in late 2009, when she lived in the city of Anderson. During the next four or five months, A.M. "hung out" with Anderson and occasionally had sex with him. (Tr. 40). In the spring of 2010, A.M. moved into her sister's Indianapolis home. Soon thereafter, A.M. ended her relationship with Anderson and began dating someone else.

On the night of May 10, 2010, A.M. was visiting a friend on the east side of Indianapolis when she telephoned Anderson to ask for a ride to her sister's house on the west side. After picking up A.M., Anderson began asking her about her boyfriend and whether she had sex with him. When A.M. answered in the affirmative, Anderson struck A.M.'s head. He continued to hit her, causing A.M. pain. Anderson told A.M. that she was "now in his territory" and that she was "his bitch[.]" (Tr. 44).

---

[1] Ind. Code § 35-42-4-1.

[2] I.C. § 35-42-3-3.

[3] I.C. § 35-42-2-1.

Instead of taking A.M. to her sister's house, Anderson stopped at an off-track betting ("OTB") venue to pick up a friend, Michael Williams, and take him to work. Although Anderson left A.M. alone in the vehicle while he went inside the OTB, A.M. did not leave because Anderson "had already been hitting [her]," and she believed he "would have chased [her] and try [sic] to hit [her] some more." (Tr. 45).

Anderson told Williams that "he had some stuff to do on the west side in the morning, he didn't feel like going back east" and asked if he could "just chill" at Williams's apartment until the morning while Williams was at work. (Tr. 97). Anderson offered to pick up Williams when his shift ended at 7:00 a.m. Williams agreed and gave Anderson the key to his apartment.

Anderson continued driving A.M. around after dropping off Williams at work. At one point, he stopped at a liquor store and bought some beer. A.M. again stayed in the car because she did not know where she was, and it was dark. From the liquor store, Anderson drove to an acquaintance's house. After arguing with A.M., Anderson told her to get out of the car, which she did. Anderson then threw a beer bottle at A.M. but missed.

After A.M. left the vehicle, Anderson telephoned A.M.'s sister, Marquirite Brooks, and told her that A.M. had "tripped when she got out of the car and started walking . . . ." (Tr. 107). By this time, A.M. had walked to a gas station and also telephoned Brooks. A.M., unaware that Anderson was on hold with Brooks, asked Brooks to pick her up and gave Brooks her location. Brooks "clicked over and told

3

[Anderson], [A.M.] [was] at the Speedway, go get her." (Tr. 109). Brooks then told A.M., "okay, he's—he [sic] about to come and get you." (Tr. 50). A.M. thought Brooks meant Brooks's boyfriend would be picking her up.

Before hanging up, Anderson told Brooks they would be at the house in forty-five minutes. Knowing it would not take so long to get to her house, Brooks tried calling Anderson back several times, but the telephone calls kept going to voice mail.

By the time Anderson arrived at the gas station, it was raining. Tired, wet, and believing that Anderson "had calmed down and everything was okay and he was just gonna [sic] take [her] to [her] sister's house," A.M. got in the car. (Tr. 50). Instead, Anderson drove to Williams's apartment complex.

Before he got out of the car, Anderson kept asking, "you thought I was gonna [sic] pick you up, but you didn't have to give me nothing?" (Tr. 51). Anderson then went to the passenger's side, grabbed A.M.'s arm, and pulled her out of the car. (Tr. 51). Anderson then threw A.M.'s bag into a dumpster. As A.M. tried to retrieve her bag, Anderson started "tussling" with her before pulling A.M. by the hair and dragging her into the apartment building. (Tr. 52). When A.M. protested, Anderson threatened to punch her. He then unlocked the door to Williams's apartment and forced A.M. inside.

When A.M. tried to escape, Anderson pushed her down to the floor. He then "stomped on [her] back" and pinned her neck down with his knee. (Tr. 54). A.M. struggled with Anderson, who pushed A.M. onto a sofa. Anderson then "unzipped his

4

pants and he started wiggling his-self [sic] in [A.M.'s] face." (Tr. 54). Anderson next made A.M. undress and take a shower.

When A.M. finished showering, she returned to the living room, where Anderson had put her clothes. As she started getting dressed, Anderson grabbed A.M. by the pants and pushed her down on the sofa. A.M. pleaded to Anderson to stop and let her go to her sister's house, but Anderson kept telling her that she was "[a]bout to give [him] some." (Tr. 56). Anderson then hit A.M. and pinned her down. Despite A.M.'s protests, Anderson "put his private part inside [her] vagina." (Tr. 57).

After Anderson ejaculated, he "got off" of A.M. and let her get dressed. (Tr. 57). Anderson then drove A.M. to her sister's house. Before A.M. got out of the vehicle, Anderson threatened that he would "find" A.M. if she called the police. (Tr. 58).

After dropping off A.M., Anderson returned to Williams's work at approximately 4:00 a.m. Anderson gave Williams his key back and "said he'd just take care of his business later on in the day." (Tr. 98). Williams did not see Anderson again that day.

Later that morning, after Brooks noticed several bruises on A.M., A.M. informed her that Anderson had "beat [her] up." (Tr. 59). She did not tell her sister that Anderson had raped her because she did not want to upset her sister. (Tr. 59). A.M.'s sister telephoned the police, who had A.M. transported to a hospital. A.M. told hospital personnel that Anderson had raped her.

A physical examination conducted by a forensic nurse examiner revealed several bruises to A.M.'s head and body in addition to burst blood vessels in her eye, an injury

5

commonly caused by pressure to the neck. A.M. also suffered a laceration to her vagina, which was "consistent with a sexual assault[.]" (Tr. 152).

Using a Sexual Assault Evidence Collection Kit, the forensic nurse swabbed A.M.'s vagina for evidence. She also collected A.M.'s underwear. Anderson subsequently stipulated that tests revealed seminal material on the vaginal swab and A.M.'s underwear and that, to a reasonable degree of scientific certainty, he was the source of DNA extracted from both samples.

Detective Dale Horstman, a criminal investigator with the Speedway Police Department, interviewed A.M. Detective Horstman observed several injuries, including bruises to A.M.'s head and body and burst blood vessels in A.M.'s eye. Although A.M. did not know the address, Detective Horstman was able to locate Williams's apartment based on a description given by A.M. With Williams's cooperation, Detective Horstman confirmed that the lay-out of the apartment was as A.M. had described it.

On June 8, 2010, the State charged Anderson with Count 1, rape as a class B felony; Count 2, criminal confinement as a class C felony; Count 3, criminal confinement as a class C felony; Count 4, battery, as a class A misdemeanor; Count 5, battery, as a class A misdemeanor; and Count 6, battery, as a class A misdemeanor. The trial court commenced a two-day jury trial on June 6, 2011, after which the jury found Anderson guilty as charged.

For purposes of sentencing, the trial court merged Count 3 with Count 1 and Counts 5 and 6 with Count 4. The trial court then sentenced Anderson to concurrent sentences of fifteen years on Count 1, eight years on Count 2, and one year on Count 4.

Additional facts will be provided as necessary.

DECISION

Anderson asserts that the prosecutor committed misconduct.

> In reviewing a properly preserved claim of prosecutorial misconduct, we determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.

*Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006) (internal citations omitted).

Here, Anderson contends that the State "threw an evidentiary harpoon," by eliciting certain testimony from Williams, "and then used the harpoon in its closing statement." Anderson's Br. at 9. "An evidentiary harpoon involves the deliberate use of improper evidence to prejudice the defendant in the eyes of the jury." *Williams v. State*, 512 N.E.2d 1087, 1090 (Ind. 1987).

In support of his contention that the prosecutor committed misconduct, Anderson cites the State's direct examination of Williams, during which Williams testified as follows:

Q      Did Detective Horstman end up showing up at your apartment?

A      Yes, ma'am.

. . . .

Q      At that point, when Detective Horstman shows up at your house, do you learn that a sexual assault may have occurred in your home?

A      He said he couldn't really give me detail[s], but he mentioned that.

Q      Okay. At some point, after Detective Horstman comes and takes items from your house, months down the road did you give a deposition in this matter?

A      I don't know how long after, but yes.

. . . .

Q      And when you went to give a deposition and you were waiting to give your deposition, did you ever recognize a woman in the room with you as being the woman who was in the back seat [of Anderson's vehicle]?

A      Not when I first got there. . . . [W]hile I was there I learn[ed] that that was the young lady.

Q      Okay. And did you in fact pass her a note before you left that day?

A      Yep.

Q      And did you ask her to please forgive you and you did not know that this was going to happen at your house?

A      Correct.

(Tr. 98-100).

8

On redirect, the State questioned Williams as follows: "But at no point did you realize at the time you gave your key that he was going to take a woman to your apartment and rape her, right?" (Tr. 102-03). Anderson objected, arguing that the State's question was argumentative. Anderson, however, did not seek an admonishment or move for a mistrial.

The trial court overruled Anderson's objection, whereupon the State continued its examination as follows:

> Q        Did you have any idea when the defendant asked you for the keys to your apartment that he was going to take a woman to your apartment and rape her there?
>
> A        I didn't know one way or the other.

(Tr. 103).

During its closing argument, the State argued as follows:

> But here's the part that stuck out most to me. [Williams] described the defendant as his friend, right. He said, I would call him a friend. Maybe not a best friend, but he's my friend.
>
> What does Michael Williams do the next time that he sees [A.M.]? It's at the deposition you heard about; all the witnesses in this case having a deposition taken of them. What does the defendant's own friend say to [A.M.]? Not I can't believe you're the girl accusing my friend of raping you, my friend wouldn't do that. I can't believe you would say my friend took you to my apartment and raped you. That's not what he says. What Michael Williams does is passes her a note that says, I didn't know he would do this to you. Please, God, forgive me for giving him my key. And that's, to me, is some of the most telling testimony that you heard and what it shows is it shows what even his own friends think about him.
>
> But when I asked [Williams], did you know that the defendant was going to take a woman to your apartment and rape her? I didn't know one

9

way or the other. So it's not this off-base idea. His own friend feels sorry for this woman that he gave the key and allowed her to be raped in his place.

(Tr. 201-02).

A review of the record shows that Anderson did not object to the State's initial direct examination of Williams. As to the redirect examination, Anderson objected but failed to seek an admonishment or move for a mistrial. Furthermore, Anderson neither objected, sought an admonishment nor moved for a mistrial in response to the State's closing argument.

> When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. If the party is not satisfied with the admonishment, then he or she should move for mistrial. Failure to request an admonishment or to move for mistrial results in waiver. Where a claim of prosecutorial misconduct has not been properly preserved, our standard for review is different from that of a properly preserved claim. More specifically, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm."

*Cooper*, 854 N.E.2d at 835.

Anderson has failed to properly preserve his claim of prosecutorial misconduct. Accordingly, Anderson must establish not only the grounds for prosecutorial misconduct but also the grounds for fundamental error. *See Cooper*, 854 N.E.2d at 835; *Booher v. State*, 773 N.E.2d 814, 818 (Ind. 2002).

10

The record shows that Anderson's counsel cross-examined Williams, and therefore, had the opportunity to refute that Williams had direct knowledge regarding what had occurred in his apartment. The record further shows that Williams admitted that he "didn't know" what Anderson intended to do in his apartment but only inferred what had happened based on his conversation with Detective Horstman. (Tr. 103). Furthermore, in addition to Williams's testimony, the jury heard extensive testimony from A.M. regarding Anderson's offenses against her, and the State presented substantial physical evidence corroborating A.M.'s testimony.

Given the testimony, along with the additional evidence in this case, we find that Anderson's claim of prosecutorial misconduct does not constitute fundamental error. The State's implied assertion that Anderson must have raped A.M. because Williams believed he had did not so prejudice Anderson as to make a fair trial impossible or constitute blatant violations of basic and elementary principles of due process. We therefore find no reversible error.

Affirmed.

NAJAM, J., and RILEY, J., concur.