**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**CHRISTOPHER A. CAGE**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GARY R. ROM**
Deputy Attorney General
Indianapolis, Indiana



FILED

Sep 13 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

DELON CHURCHILL,                    )
                                    )
    Appellant-Defendant,            )
                                    )
        vs.                      )    No.  48A02-1111-CR-1108
                                    )
STATE OF INDIANA,                   )
                                    )
    Appellee-Plaintiff.             )

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Thomas Newman, Jr., Judge
Cause No. 48D03-1007-FB-323

September 13, 2012

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Delon Churchill appeals his convictions for Robbery,[1] a class B felony, and four counts of Criminal Confinement,[2] a class B felony. Specifically, Churchill argues that testimony regarding a telephone call that his mother made to the police constituted inadmissible hearsay and its admission into evidence violated his right of confrontation. Churchill also contends that he is entitled to a reversal of his convictions because there were several instances of prosecutorial misconduct, that the convictions for both robbery and criminal confinement violated double jeopardy principles, and that he was improperly sentenced.

We conclude that the admission of the evidence regarding the telephone call that Churchill's mother made to law enforcement officials was properly admitted into evidence and that there was no prosecutorial misconduct. However, Churchill's convictions and sentences on the confinement counts must be vacated in light of double jeopardy principles. Finally, we conclude that the trial court did not abuse its discretion in sentencing Churchill and that the twenty-year sentence imposed for robbery was not inappropriate.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions that the trial court vacate the convictions and sentences on the four confinement counts.

---

[1] Ind. Code § 35-42-3-3(a)(1)(b)(2)(A).

[2] I.C. § 35-42-3-3(a)(1)(b)(2)(A).

FACTS

Shortly before 11:00 a.m. on July 16, 2010, Churchill entered the First Merchant's Bank (Bank) in Anderson. No other customers were inside, and Churchill approached the teller counter and asked Jason Horning to change three $20 bills into $5 bills. After Horning removed the money from the drawer, Churchill produced a handgun and said, "this is a robbery," and demanded that Horning give him money. Tr. p. 196, 199, 229. The teller next to Horning, Jama Doyle, looked up when she heard this, and Churchill pointed the gun at her face and told her to raise her hands. Churchill also pointed the gun at Tim Hunt, the branch manager, and Preston Beamer, the drive-through teller, and instructed them to put their hands up.

Churchill told Horning to use a bank courier bag for the money. Although Horning began to empty the money from his drawer into the courier bag, he left "bait money" in the drawer because Churchill stated that he did not want any "funny money" or a dye pack. Tr. 201, 233, 257. The bait money consisted of ten $10 bills and was the only money that was wrapped with a band that had a teller stamp on it. The bait money had also been photocopied.

Churchill instructed Horning to retrieve the money from the drive-through where Beamer had been balancing the drive-through drawer before Churchill entered. Horning walked to the drive-through area and Churchill told him to move faster. Horning placed the money in the bag, and when he returned to his drawer, Churchill told him to empty the rest of his drawer. This time Horning placed the bait money and mutilated marked

3

money into the bag. Horning returned the bag, which included nearly $6455 of the bank's money. Before Churchill left, he pointed his gun at the employees and told Horning to lie on the ground and Hunt to lie next to Horning. Churchill then told Beamer and Doyle to lie on top of Horning and Hunt with their faces towards the ground. Churchill exited the bank, and after the bank employees were sure that Churchill was gone, Horning locked the front door and tripped an alarm to alert the police.

After the robbery occurred, Churchill's identity remained unknown, so a photograph taken from the bank's surveillance video was released to various news outlets around the Indianapolis area and to local newspapers. No details concerning the robbery were released other than the photograph. At some point, Churchill's mother called the police and told them that her son was the robber. Meanwhile, Tyson McCoy, who was a friend of Churchill, borrowed his brother's identification card to rent a motel room and drove Churchill to a Muncie motel. Once Churchill's identity was known, law enforcement officials obtained a warrant to trace Churchill's location through his cell phone. The police learned that Churchill was in a Muncie motel and waited outside his room to arrest him.

When Churchill exited the room, he was arrested. He had a large duffel bag with him that contained approximately $2600 in cash, including all of the bait money that had been photocopied. Inside the motel room was Churchill's identification card, the band that wrapped the bait money, and mutilated money.

4

An investigator compiled a photo array and showed it to the four bank employees. Doyle, Horning, and Hunt all identified Churchill as the bank robber from those pictures. It was established that Churchill wore a red Philadelphia Phillies baseball cap during the robbery. At some point, police officers found a red Philadelphia Phillies baseball cap near a security fence on the eastside of the bank's property. The brim of the cap contained DNA evidence in which at least two people could not be excluded as contributors. Churchill was one who could not be excluded as a contributor to the DNA. It was also determined that the day before the robbery, a law enforcement officer came into contact with Churchill and saw him wearing such a cap.

When Churchill was incarcerated, he told a cellmate that he was in jail for bank robbery. Churchill confessed to his cellmate that he asked the teller to make change, demanded that the money be put in the bag, and said that he "stacked the people on top of each other." Tr. p. 406. Churchill also acknowledged that when he fled from the bank, he dropped his hat in a parking lot. Churchill also explained that a man named "Ty" was driving the getaway vehicle and that they split the money. Churchill then stated that Ty took him to a Muncie hotel and dropped him off there.

On July 19, 2010, the State charged Churchill with Count I, robbery, a class B felony, and four counts (II-V) of class B felony criminal confinement. Churchill's jury trial commenced on October 25, 2011.

During opening statements, the deputy prosecutor told the jury that Churchill's mother had identified him as the robber. And during the testimony of Detective Randy

5

Tracy of the Anderson Police Department, the deputy prosecutor was permitted, over objection, to have Detective Tracy recount, to the jury, the statements that Churchill's mother gave to the jury. The deputy prosecutor argued that the statements were admissible because they were being offered, not for the truth of the matter asserted, but to show why the police investigation was focused on Churchill.

The trial concluded on October 28, 2011, with the jury finding Churchill guilty as charged. On November 14, 2011, the trial court sentenced Churchill on Count I, robbery, and Count II, criminal confinement, to twenty years of imprisonment to the Indiana Department of Correction (DOC) to be served consecutively. Churchill also received twenty years of imprisonment at the DOC on each remaining confinement count to be served concurrently with the confinement charge in Count II. Thus, Churchill received an aggregate sentence of forty years of incarceration in the Indiana Department of Correction (DOC).

In imposing the sentence, the trial court identified Churchill's criminal history, the fact that he was on probation when he committed the offense, the fact that he was on parole when he committed the offense, and the fact that he was charged with another offense while the charges in this case were pending as aggravating factors. The trial court found no mitigating factors. Churchill now appeals.

DISCUSSION AND DECISION

## I. Admission of Evidence

Churchill claims that the trial court erred in permitting his mother to testify at trial that she had contacted Detective Tracy on the night of the robbery to report that it was her son in the photographs that were shown on the news. Churchill maintains that the testimony was inadmissible hearsay and that it violated his right to confrontation.

The admission or exclusion of evidence falls within the sound discretion of the trial court, and the determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. Id. In determining the admissibility of evidence, we will only consider the evidence in favor of the trial court's ruling and the unrefuted evidence in the defendant's favor. Sallee v. State, 777 N.E.2d 1204, 1210 (Ind. Ct. App. 2002). We will not reverse the trial court's decision to admit or exclude evidence if that decision is sustainable on any ground. Crawford v. State, 770 N.E.2d 775, 780 (Ind. 2002).

At trial, the following exchange occurred between the deputy prosecutor and Detective Tracy:

Q [You] spoke to a person named Regina Churchill, is that correct?

A Yes, I did.

Q What information did she provide to you?

7

A That she knew who did the robbery from looking at the newscast.

. . .

Q What information did she provide you detective? Did the [sic] give you the name of the person she said was involved in the robbery?

A Yes. She gave me the name of Delon Churchill.

Q Did she tell you who that person was?

A Yes, her son.

Q Her son. Once you got the name of Delon Churchill, did you begin focusing the investigation on the defendant?

A Yes, I did.

Tr. p. 479-80.

We initially observe that to preserve an issue for appeal, a defendant must make a contemporaneous objection, on the same grounds as those raised on appeal, at the time the evidence is elicited at trial. Haycraft v. State, 760 N.E.2d 203, 211-12 (Ind. Ct. App. 2001). Also, an evidentiary objection at trial that was based only on the rules of evidence is not sufficient to preserve a claim that is premised on the Sixth Amendment. Perry v. State, 956 N.E.2d 41, 51 (Ind. Ct. App. 2011).

At trial, Churchill objected to the above testimony claiming only that it was inadmissible hearsay. Tr. p. 478. However, on appeal, Churchill maintains that the testimony violated his right to confront witnesses pursuant to the Sixth Amendment to the United States Constitution. As a result, Churchill has waived the constitutional issue.

8

Waiver notwithstanding, we note that in <u>Crawford v. Washington</u>, the United States Supreme Court held that the Sixth Amendment does not permit the admission of testimonial statements of a witness who does not appear at trial unless he or she is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. 541 U.S. 36 at 53-54. The <u>Crawford</u> Court did not offer a comprehensive definition of testimonial evidence, but it declared that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." <u>Id.</u> at 68. <u>Crawford</u> also described testimonial statements as:

> [E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. . . .

The definition of testimonial statements was then clarified in <u>Davis v. Washington</u>, as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

9

547 U.S. 813, 822 (2006).

In concluding that the statements at issue in <u>Davis</u> were not testimonial, the following factors were considered: (1) whether the declarant was speaking about events as they were actually happening or describing past events; (2) whether the declarant was facing an ongoing emergency; (3) whether the questions asked by law enforcement were such that they elicited statements necessary to resolve the present emergency rather than simply to learn about past events; and (4) the level of formality of the interrogation. <u>Id.</u> at 827-28.

In our view, the tip that was provided by Churchill's mother identifying him as the robber was nontestimonial, because there was no formal interrogation and the information was not gathered in preparation of future litigation. <u>See</u> <u>Wright v. State</u>, 916 N.E.2d 269, 277 (Ind. Ct. App. 2009) (finding the statements were not testimonial in part because they were not elicited for the preparation of litigation).

As noted above, Churchill's mother contacted the local police after seeing a picture of the robber on the local media outlets. The statements were not made in the formal setting of an official statement to police or during police interrogation. Rather, her statements were used to solve the ongoing emergency of locating an armed and dangerous robber. Thus, the statements were nontestimonial in nature and did not infringe on Churchill's Sixth Amendment right to confrontation.

Also, with regard to Churchill's claim that the testimony quoted above constituted inadmissible hearsay evidence, we note that hearsay has been defined as "a statement,

10

other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. R. Evid. 801(c). "An out-of-court statement introduced to explain why a particular course of action was taken during a criminal investigation is not hearsay because it is not offered to prove the truth of the matter asserted." Goodson v. State, 747 N.E.2d 1181, 1185 (Ind. Ct. App. 2001).

In this case, the State sought to introduce the testimony from Detective Tracy about Churchill's mother's telephone call to establish why law enforcement focused its investigation on Churchill. Tr. p. 478. The identity of the robber was unknown when Detective Tracy received the call from Churchill's mother. Id. at 475.

As noted above, Indianapolis television stations and local newspapers had shown a picture of the robber. Id. at 380, 390. Churchill's mother called Detective Tracy when she saw the photo and recognized the robber as her son. Id. at 479-80. The State sought to admit the testimony, "not for [the purpose] of proving the truth of the matter asserted, but [to explain] why the investigation focused on the defendant and why we just didn't pull him out of the sky as the person involved in this crime." Id. at 478.

By the time that the State had elicited Detective Tracy's testimony, the State had not yet established why the police were pursuing Churchill as the suspect. In essence, Detective Tracy's testimony of the phone call served that purpose and permitted the State to show the jury why the police had undertaken a particular course of action.

Finally, we note that even though the testimony established why law enforcement officials focused their investigation on Churchill, a reasonable level of assurance is

11

required to show that the third-party statement was not received by the trier of fact as evidence of truth. Goodson, 747 N.E.2d at 1185. "[T]hat assurance may arise from an immediate limiting instruction or from the sketchiness of the testimony itself." Id. Indeed, at Churchill's trial, the trial court gave the following limiting instruction: "Ladies and Gentlemen the answer isn't offered for [its] truthfulness or the falsity of it, whether or not it was true or not true. It's being offered to show why the police officer then proceeded to conduct an investigation in the way that they did." Id. at 479.

In light of this instruction, and for all of the reasons discussed above, we conclude that the trial court did not abuse its discretion in admitting the testimony regarding Churchill's mother's contact with Detective Tracy.

## II. Prosecutorial Misconduct

Churchill next claims that his convictions must be reversed because various instances of prosecutorial misconduct occurred. Specifically, Churchill argues that the deputy prosecutor's reference to Churchill's mother's telephone call to the police constituted misconduct. Churchill also maintains that the deputy prosecutor was attempting to prevent the jury from seeking the truth or was implying that defense counsel was attempting to circumvent the justice system through falsity, that he improperly interjected race into the proceedings, that the deputy prosecutor improperly expressed his personal opinion as to whether the photograph of the robber looked like Churchill, and that he made improper comments about members of the black community in Madison County who have gold teeth.

12

## A.  Standard of Review

The review of a prosecutorial misconduct claim requires two steps.  First, we must determine whether the prosecutor engaged in misconduct.  Carter v. State, 956 N.E.2d 167, 169 (Ind. Ct. App. 2011), trans. denied.  We then determine "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected."  Id.  The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.  Booher v. State, 773 N.E.2d 814, 817 (Ind. 2002).

When the error is not preserved by a contemporaneous objection, as are the circumstances here, the defendant must not only establish the grounds for prosecutorial misconduct but also the grounds for fundamental error in order to succeed on his claim.  Id. at 818.  Fundamental error is a "substantial, blatant violation of due process" that is so prejudicial to the rights of the defendant that a fair trial was impossible.  Hall v. State, 937 N.E.2d 911, 913 (Ind. Ct. App. 2010).

## B.  Churchill's Claims

As discussed above, the deputy prosecutor initially introduced evidence of the telephone call from Churchill's mother for the purpose of establishing why the police focused its investigation on Churchill.  The State subsequently published the recording of Detective Tracy interrogating Churchill to the jury.  Included in the interrogation was evidence that Churchill's mother had called Detective Tracy to identify Churchill as the robber.

Churchill did not object during the State's opening statement, and the deputy prosecutor's statements were not improper because they were based on evidence that was properly admitted at trial. Thus, the deputy prosecutor did not commit misconduct by commenting on substantive evidence, and Churchill has failed to show that any error occurred.

Next, Churchill's counsel during final argument maintained that the large amount of cash in Churchill's possession was drug money and that McCoy, Churchill's accomplice, was also probably in the room. The deputy prosecutor responded to Churchill's counsel as follows:

> Do you believe that whopper that you just heard? You need to send him home. You really do, if you believe that, you need to send him home. Mr. Alger, a massive amount of evidence. You know what, when you're a defense attorney, you're Mr. Alger sitting over there trying to defense [sic] this massive amount of evidence, you've gotta start making stuff up. Where did you hear any evidence from anyone anybody [sic] else was in that room? You heard evidence that another person got the room for him. You never heard anybody say anybody else was in that room. Mr. Alger has to stretch the truth and the evidence and fool you, manufacture the illusion of reasonable because the facts don't support his case. Who said that? Who said that anybody else ever in that room? The evidence was that Tyson McCoy rented that room with Wade McCoy's ID. That's the evidence. There was never any evidence anybody was in that room. Never any evidence that a drug transaction took place. He says that as an excuse to explain why he's got several thousand dollars. There was never any evidence that someone sold him any crack and he used the money from the bait money, but Mr. Alger has to make that up.

Tr. p. 575-76.

In our view, it is apparent that the deputy prosecutor was not arguing that defense counsel was attempting to prevent the jury from seeking the truth or that defense counsel

14

desired to circumvent the justice system through falsity. Rather, the deputy prosecutor was responding to defense counsel's arguments and emphasizing that the evidence presented at trial did not support his argument. By doing so, we cannot say that the deputy prosecutor engaged in misconduct. See Cooper v. State, 854 N.E.2d 831, 836 (Ind. 2006) (holding that prosecutors may respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable).

Even assuming solely for the sake of argument that the comments amounted to misconduct, there is no indication that Churchill was placed in grave peril such that a fair trial was impossible. Indeed, the State presented substantial evidence against Churchill. See Paschall v. State, 825 N.E.2d 923, 925 (Ind. Ct. App. 2005) (noting that even though the prosecutor's conduct was unprofessional, the State nonetheless presented a strong case against the defendant and thus the misconduct did not place the defendant in grave peril).

Next, Churchill contends that the deputy prosecutor interjected race into the proceedings when defense counsel did not. However, defense counsel implied that it was easy for the employees at the Bank to make their in-court identifications of Churchill as a robber because Churchill was an African-American man, as was the robber. Tr. p. 569-70. That said, there is no indication that the deputy prosecutor sought a conviction because of Churchill's race. See Appellant's App. p. 20. In fact, the deputy prosecutor asserted that Churchill's race had nothing to do with his guilt. Rather, it was made clear that Churchill was guilty because the evidence supported his guilt beyond a reasonable

15

doubt. Tr. p. 575-76. Moreover, it appears that any reference to race made by the deputy prosecutor was in response to the allegations and inferences raised by defense counsel.

Defense counsel further argued that the photograph of the bank robber from the surveillance video looked like Churchill, but he believed it "very easily" could have been McCoy. Tr. p. 566. Defense counsel remarked that a "high percentage" of African-Americans between the ages of twenty and thirty have gold or silver teeth. Tr. p. 568. Churchill claims that the deputy prosecutor improperly expressed his personal opinion concerning whether the photograph of the robber looked like Churchill and about members of the black community in Madison County who have gold teeth.

More particularly, the deputy prosecutor first argued that the jury could tell by examining the photograph of the robber that it was Churchill. Id. at 577. The deputy prosecutor then countered defense counsel's assertion that a "high percentage" of African-Americans have gold or silver teeth. Id. at 579. As stated earlier, a prosecutor is permitted to respond to allegations and inferences raised by the defense even if the response would otherwise be objectionable. Dumas v. State, 803 N.E.2d 1113, 1118 (Ind. 2004). Thus, even had Churchill objected to the prosecutor's comments, there is no showing that he was placed in grave peril. For all these reasons, Churchill's prosecutorial misconduct claims fail.

### III.  Double Jeopardy Claims

Churchill next claims that his convictions for both robbery and four counts of criminal confinement cannot stand. Specifically, Churchill argues that the double

16

jeopardy provision of the Indiana Constitution was violated when the trial court entered a judgment of conviction and sentences for both robbery and criminal confinement because his actions of confining the victims "were simply those that were necessary to commit robbery." Appellant's Br. p. 22.

In resolving this issue, we note that in accordance with Article 1, Section 14 of the Indiana Constitution, two or more offenses are the "same offense" for double jeopardy purposes when "with respect to either the statutory elements of the charged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another offense." Vanzandt v. State, 731 N.E.2d 450, 455 (Ind. Ct. App. 2000) (quoting Richardson v. State, 717 N.E.2d 32, 49 (Ind. 2000)).

As to the "actual evidence test," the necessary inquiry is "whether each offense was established by separate and distinct facts." Id. To establish a double jeopardy violation, the defendant must demonstrate a reasonable probability that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of the second challenged offense. Id. To determine what facts were used by the jury, we consider the evidence, charging information, final jury instructions, and arguments of counsel. Goldberry v. State, 821 N.E.2d 447, 459 (Ind. Ct. App. 2005).

The crime of robbery consists of taking property "by using or threatening the use of force" or "by putting any person in fear." Ind. Code § 35-42-5-1. Criminal

17

confinement consists of confining a person or removing the person by fraud, enticement, force, or threat of force from one place to another. Ind. Code § 5-42-3-3.

Our Supreme Court has held that "where the confinement of a victim is greater than that which is inherently necessary to rob [the victim], the confinement, while part of the robbery is also a separate criminal transgression." Hopkins v. State, 759 N.E.2d 633, 639 (Ind. 2001). Thus, where the criminal episode was "protracted" over time, and the criminal confinement of the victims had been "completed" by their removal from one floor of the residence to another before being robbed, there was "no substantial likelihood that the jury based its determination of guilt on the confinement counts upon the evidence of the incidental confinement at the moment of the robbery." Id. at 640.

In this case, the charging information alleges in its first count that Churchill, while "armed with a deadly weapon," took money from the four bank employees by "by using or threatening the use of force"; in its second count, that "while armed with a deadly weapon," he "confine[d]" Jason Horning. In its third count, that "while armed with a deadly weapon," he "confine[d]" Preston Beamer. The information alleged in its fourth count that Churchill, "while armed with a deadly weapon," "confine[d]" Jama Doyle; in its fifth, that "while armed with a deadly weapon," he "confine[d]" Tim Hunt. Appellant's App. p. 166-70.

The trial court's final instructions included the allegations that were set forth in the charging information. The final instructions also specified the elements that the State must prove beyond a reasonable doubt by mirroring the allegations contained in the

18

charging information, including that Churchill, "while armed with a deadly weapon, . . .

took property from . . . [Bank] personnel Jason Horning, Preston Beamer, Jama Doyle

and Tim Hunt, . . . "while armed with a deadly weapon." Appellant's App. p. 21. The

informations also stated that Churchill "knowingly "confine[d] . . . Hunt, Beamer,

Horning and Doyle . . . without their consent, . . . .while armed with a deadly weapon, to-

wit: a handgun." Id. at 21-23.

In its opening statement, the deputy prosecutor indicated that the evidence would

establish that Churchill entered the Bank, displayed his gun, demanded money from the

tellers, took money from them, and left the bank. The deputy prosecutor made no

reference to any further act of confinement. Tr. p. 179-92. In its closing argument, the

State asserted that Churchill devised a scheme to rob the Bank, entered the building with

a "gun in his hand, scaring people to death, taking their money, laying them down on the

floor, thing [sic] their [sic] gonna be shot. Thought they were gonna be killed. . . ." Id. at

546-47. Later in its rebuttal argument, the deputy prosecutor asserted that the jury

should find Churchill guilty of "robbing a bank and confining those people and forcing

them at gunpoint to lay on the floor." Id. at 585.

In addition to the above, all four victims were consistent when testifying that they

had not been moved from one location to another. Rather, they acknowledged that they

were forced to lie on the floor behind the bank counter where they were standing. Other

than directing Beamer and Doyle to lie on top of Horning and Hunt, at no time did

Churchill try to move or otherwise confine the victims. No physical contact occurred

19

between Churchill and the victims, and there were no threats made other than the pointing of the gun at the victims. Thus, the evidence, charging information, instructions, and argument did not clearly portray the commission of both robbery and confinement as distinct offenses.

The entire criminal episode was brief, and the testimony of the witnesses established that the confinement in all instances was coextensive with the robbery. Again, the victims were not moved, they were directly behind the counter at all times, and Churchill exited the building as soon as all of the employees were on the ground. In short, the confinement was no greater than necessary to accomplish the robbery. Harvey v. State, 719 N.E.2d 406, 411 (Ind. Ct. App. 1999).

To further illustrate, in Vanzandt v. State, 731 N.E.2d 450 (Ind. Ct. App. 2000), the evidence established that the armed defendant had ordered the victims to lie on the floor while he took money from the cash register and fled. A panel of this Court found "an absence of evidence to establish the essential elements of the confinement of [the victim] independent of the robbery of [the victim]." Id. at 455. Thus, the defendant had "demonstrated a reasonable possibility that the jury used the same evidentiary facts to establish criminal confinement of [the victim] as a class B felony as it did to establish the essential elements or robbery of [the victim] as a class B felony." Id.

In this case, like Vanzandt, Churchill's "forcing" the victims "to lie on the floor" was "not separate and apart from the force used to effect the robbery." That said, these facts demonstrate a reasonable possibility that the jury used the same evidentiary facts to

20

establish Churchill's criminal confinement of the robbery victims and to establish the essential elements of robbery of the victims. Hence, a violation of the double jeopardy clause of the Indiana Constitution has occurred, and Churchill's convictions and sentences for criminal confinement must be vacated.

## IV. Sentencing

### A. Abuse of Discretion

Churchill next argues that the trial court abused its discretion in sentencing him. Specifically, Churchill maintains that the "trial court's imposition of maximum consecutive sentences herein was not supported by the required sentencing statement." Appellant's Br. p. 25.

We note that sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference. Cardwell v. State, 895 N.E.2d 1219, 1222 (Ind. 2008). A trial court may impose any sentence "within the allowable range for a given crime without a requirement to identify specific aggravating or mitigating circumstances." Id. "The trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence." Id. We may review the reasons given and the omission of reasons arguably supported by the record for abuse of discretion; however, the "relative weight or value assignable to reasons properly found or those which should have been found is not subject to review for abuse." Id.

21

A sentencing court abuses its discretion only if its decision was "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007), clarified on reh'g on other grounds, 875 N.E.2d 218 (Ind. 2007). An abuse of discretion will also be found if the trial court (1) fails "to enter a sentencing statement at all[,]" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons," (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration," or (4) considers reasons that "are improper as a matter of law." Id. at 490-91.

Contrary to Churchill's contention that the trial court's sentencing statement was inadequate, it made the following remarks:

> Aggravating circumstances is the defendant has a history of criminal and delinquent activity, as noted in the pre-sentence report. He also was on probation at the time the alleged offense occurred. He was on parole supervision when this offense occurred. He also accrued new criminal charges while incarcerated in Madison County Jail pending these [sic] case. No mitigating circumstances.

Tr. p. 624.

From the above, it is apparent that the trial court clearly identified four reasons for the sentence it imposed. Thus, Churchill's claim that the trial court abused its discretion in sentencing him fails. See Webb v. State, 941 N.E.2d 1082, 1088 (Ind. Ct. App. 2011)

22

(noting no abuse of discretion when the trial court's sentencing statement listed four aggravating circumstances), <u>trans.</u> <u>denied</u>.[3]

B.  Inappropriate Sentence

Churchill also argues that the sentence that was imposed was inappropriate.  More specifically, Churchill contends that the imposition of the maximum sentence in light of the circumstances of the offenses and his character is inappropriate.

We have the constitutional authority to revise a sentence if it is determined that the sentence is "inappropriate in light of the nature of the offense and the character of the offender."  Ind. Appellate Rule 7(B).  We are required to give "due consideration" to the trial court's sentencing decision.  <u>Akard v. State</u>, 937 N.E.2d 811, 813 (Ind. 2010).  The principal role of appellate review is to attempt to "leaven the outliers."  <u>Cardwell</u>, 895 N.E.2d at 1225. In making this determination, we may look to any factors appearing in the record.  <u>Calvert v. State</u>, 930 N.E.2d 633, 643 (Ind. Ct. App. 2010).  The defendant bears the burden of persuading this Court that his sentence is inappropriate.  <u>Anglemyer</u>, 868 N.E.2d at 494.

We also note that the question under Appellate Rule 7(B) analysis is "not whether another sentence is more appropriate" but rather "whether the sentence imposed is inappropriate."  <u>King v. State</u>, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008).  In analyzing the appropriateness of a sentence we concentrate "less on comparing the facts of this case

---

[3] Although Churchill contends that the trial court also abused its discretion in ordering consecutive sentences in this case, we need not address this issue because we have vacated the convictions and sentences with regard to the four confinement counts on double jeopardy grounds.  Thus, only Churchill's sentence for robbery stands.

to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character." Paul v. State, 888 N.E.2d 818, 825 (Ind. Ct. App. 2008).

To assess the appropriateness of the sentence, we look first to the statutory ranges established for the classes of the offenses. Here, the advisory sentence for a class B felony is ten (10) years, the shortest sentence is six (6) years, and the longest sentence is twenty (20) years. Ind. Code § 35-50-2-6. As noted above, we have ordered the convictions and sentences on the confinement counts vacated. Thus, Churchill's inappropriate sentence argument is limited to the maximum twenty-year sentence that the trial court imposed on the robbery count.

As for the nature of the offense, the record shows that four victims were involved in the robbery, and two of the bank employees reported emotional injuries. Specifically, both Hunt and Doyle suffered from anxiety and job stress as a result of the robbery. Appellant's App. p. 157-58. Although no actual physical injuries resulted to any of the victims, Churchill's nature of the offense argument avails him of nothing.

As for Churchill's character, the record shows that he was twenty-five years old when he committed the offense. As a juvenile, Churchill was found to be a delinquent child on four occasions, which included a disposition for conversion and battery. Appellant's App. p. 154. As an adult, Churchill has been convicted of three drug-related

24

offenses: possession of cocaine and marijuana, both misdemeanors, and class B felony dealing in cocaine. Id. at 155-56.

Churchill was incarcerated in 2005 for his dealing in cocaine conviction and was released sometime in 2009 to parole which is not to end until September 2012. Id. at 156-57. Churchill also has convictions for operating a vehicle without ever obtaining a license and for resisting law enforcement. Id. After Churchill committed the instant offense, he was charged with possession of cocaine. Id. at 156. Since being incarcerated for this offense, Churchill has been charged with battery resulting in serious bodily injury, a class C felony; intimidation, a class D felony; and false informing, a class B misdemeanor. Id. at 157. Churchill has also previously violated his probation and had another probation violation filed against him. Id. at 155-56. And as for the instant offense, Churchill was on probationary supervision at the time, and the State filed a parole violation against him. Id. at 157. Churchill's past conduct shows that he is a high risk for recidivism. See Malenchik v. State, 928 N.E.2d 564, 569 (Ind. 2010) (recognizing that the goals of "individual penal consequences" is reformation and minimizing recidivism).

The record also demonstrates that Churchill was affiliated with a gang and participated in the group at the time he committed the offense. Appellant's App. p. 157. He also has a history of substance abuse. Id. at 159. Churchill first used marijuana at the age of thirteen and admitted that he was under the influence of it when he committed the instant offense. Id. Churchill's first used cocaine when he was fifteen years old, and he

last used the drug on the day of his arrest.  <u>Id.</u>  Churchill also reported that he abused prescription drugs.  <u>Id.</u> at 159.

In light of this evidence, it is apparent that prior attempts of probation, parole, and incarceration have not rehabilitated Churchill.  Along with his frequent contacts with the criminal justice system, Churchill's admitted illegal drug use demonstrates that he is not living a law-abiding life.  A record of repeated rehabilitation failures indicates that Churchill has no respect for the law and for the opportunities afforded him, has no desire to conform his conduct to that of a law-abiding citizen, and continues to reoffend.

As a result, Churchill has failed to show that his sentence is inappropriate when considering the nature of the offense and his character.

CONCLUSION

In light of our discussion above, we conclude that the admission of the evidence regarding the telephone call that Churchill's mother made to law enforcement officials was properly admitted into evidence.  While we find that there was no prosecutorial misconduct, Churchill's convictions and sentences on the confinement counts must be vacated in light of double jeopardy principles.  Finally, we conclude that the trial court did not abuse its discretion in sentencing Churchill and that the twenty-year sentence imposed for robbery was not inappropriate.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions that the trial court vacate the convictions and sentences on the four confinement counts.

ROBB, C.J., concurs.

BRADFORD, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

DELON CHURCHILL,          )
                                          )
    Appellant-Defendant,     )
                                          )
       vs.                )     No. 48A02-1111-CR-1108
                                          )
STATE OF INDIANA,       )
                                          )
    Appellee-Plaintiff.      )

**BRADFORD, Judge, dissenting**

I agree with the majority that evidence regarding the telephone call made by Churchill's mother was properly admitted and that there was no prosecutorial misconduct. Because I cannot, however, agree that Churchill's four criminal confinement convictions run afoul of prohibitions against double jeopardy, I respectfully dissent.

As we have noted, "[t]he offense of confinement requires proof of a substantial interference with a person's liberty without the person's consent." *Lyles v. State*, 576 N.E.2d 1344, 1352 (Ind. Ct. App. 1991), *trans. denied*, *abrogated on other grounds by Peterson v. State*, 650 N.E.2d 339 (Ind. Ct. App. 1995). This interference can be

28

accomplished either by "confin[ing] another person without the other person's consent" or "remov[ing] another person, by fraud, enticement, force, or threat of force, from one (1) place to another[.]" Ind. Code § 35-42-3-3. In cases where a person is charged with both robbery and criminal confinement, the Indiana Supreme Court has explained that "where the confinement of a victim is greater than that which is inherently necessary to rob them, the confinement, while part of the robbery, is also a separate criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001). In my view, this is precisely what happened here. Only *after* securing the money bag from Horning–thereby completing the robbery–did Churchill point his gun at the bank employees, tell Horning and Hunt to lie on the ground, and tell Beamer and Doyle to lie on Horning and Hunt. This timing of events, in my view, distinguishes this case from *Vanzandt v. State*, 731 N.E.2d 450 (Ind. Ct. App. 2000), in which the victims were confined no longer than the time needed to steal the cash from the register and the vehicle parked in front of the store. *Id*. at 452. I do not believe there is a reasonable possibility that the jury relied on the same actual evidence to convict Churchill of robbery and four counts of criminal confinement and so would affirm all of his convictions. Additionally, for reasons cited by the majority in its analysis, I would affirm the forty-year aggregate sentence imposed by the trial court.

29