**Pursuant to Ind. Appellate Rule 65(D) , this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Aug 20 2014, 9:25 am

*Kevin S. Smith*

**CLERK**

of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN B. NORRIS**
Hass Vandivier & Norris
Franklin, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**LYUBOV GORE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JASON G. SQUIER,                              )
                                             )
    Appellant-Defendant,            )
                                             )
        vs.                   )          No. 41A01-1311-CR-500
                                             )
STATE OF INDIANA,                            )
                                             )
    Appellee-Plaintiff.             )

APPEAL FROM THE JOHNSON SUPERIOR COURT
The Honorable Cynthia S. Emkes, Judge
Cause No. 41D02-1203-FC-00031

**August 20, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Senior Judge**

## STATEMENT OF THE CASE

Jason G. Squier appeals from his conviction and sentence for robbery[1] as a Class C felony, contending that there is insufficient evidence to support his conviction, that the trial court abused its discretion in sentencing by failing to recognize all mitigating circumstances, and that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Concluding as we do that there is sufficient evidence to support Squier's conviction and that the trial court committed no sentencing error, we affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

On March 22, 2012, at approximately 12:30 a.m., Justin Smith was working his regular night shift, which was from 10:00 p.m. to 6:00 a.m., at the Village Pantry located on Old Meridian Street in Greenwood, Indiana. Squier came into the store and asked to purchase a lottery ticket. In the six months that Smith had worked in the store, he had seen Squier on a few occasions but did not personally know him. Smith, who was described as usually talkative, attempted to strike up a conversation about a tattoo that Squier had on the rim of his ear, and how it must have hurt to have it created. Squier, who appeared to be emotionless, did not engage in any conversation with Smith. After Smith sold Squier the lottery ticket he had requested, Squier turned to walk toward the front door, opened the door, but did not exit.

Hearing the single door alarm, Smith assumed that Squier had exited the store, so

---

[1] Ind. Code §35-42-5-1(2) (1984).

he returned to the deli counter where he had been making sandwiches and salads for sale. Smith happened to glance back at the counter and saw Squier standing there. Smith apologized to Squier and told him he would help him. Smith returned to the counter, where Squier told Smith he wanted to purchase another lottery ticket. Smith picked out the lottery ticket, Squier paid for it, and when Smith opened the cash register to complete the transaction, Squier said, "Back away from the register. Get on your knees. I am robbing you. Put your hands up." Tr. p. 376. After Smith said, "what," Squier gave him the same instructions, and Smith complied. *Id*. at 377.

Squier then asked Smith if there was any money underneath the register drawer. Smith took the drawer out of the register and placed it on the counter so Squier could see there was nothing there. Smith told Squier he could take the whole drawer. Upon learning that there was nothing under the drawer, Squier, who now looked angry, said, "What? Is that all you can give me?" *Id*. at 380. Smith explained to Squier that he could not get into the safe, but that there was a button he could press that would give him $50 in rolled up bills. Squier told him to do so, and Smith placed the additional money in the register drawer. Although Smith did not see Squier take the paper money from the register drawer, it was there when Smith placed the drawer on the counter, but was not there after Squier walked away.

Squier told Smith to go into the back room and Smith started crawling there on his knees. After Smith asked Squier if he could stand up because crawling hurt his knees, Squier allowed him to do so. Squier, who was six foot five inches tall and weighed approximately 185 pounds, closely followed behind Smith, who was five foot eight inches

3

tall.  As Smith approached the deli counter, he turned to Squier and said, "Man, I got a four (4) month old kid at home.  Don't make him grow up without a father like I had to." *Id*. at 269.  Squier threw his head back and responded, "Don't worry, I'll take care of you." *Id*. This reply did not reassure Smith, who was scared for his life, because he was headed to the back room where there were no surveillance cameras in place.  Instead, Smith, who was ninety-nine percent certain that he would be shot, waited to hear a gunshot.  Squier followed Smith to the back room, told Smith to lock himself in the bathroom, and told him to start counting to 200.

While Smith was in the bathroom counting, he sent out text messages to three people:  his assistant manager, manager, and his wife, indicating that he was being robbed and asking them to notify the police.  When Smith's counting reached 187, he heard the store telephone ringing, and went to answer it to see if the police were calling.  As he exited the back room, he noted that Squier was no longer there, but there was another customer standing at the fountain pop machine.  The police dispatcher was on the telephone line and officers soon arrived.  Smith gave the officers Squier's description, including that he was approximately 6'7", 180 pounds, wearing blue jeans and a red T-shirt, with dark brown hair, a Chinese tattoo on his left side, and unique tattoos on his ear.  Smith also indicated that in addition to the money in the register drawer, Squier had been given a roll of money from the safe.

The manager of the Village Pantry, Denise Russell, who lived nearby, arrived shortly after the police officers.  Russell observed that Smith, who was twenty-four years old at the time of trial, was not his usual talkative, funny self, but appeared scared and on

4

the verge of tears. Russell reviewed the store's security video with police officers and recognized Squier, who was a regular patron of the store. Russell checked the cash register and the safe and noted that approximately $94.80 was missing. The system on the safe showed that fifty dollars had been removed. At trial, Russell testified to the above and that Smith had never failed to balance his register before.

After watching the surveillance video and speaking with Russell and Smith, police officers went to Squier's house to arrest him. There, they found the red T-shirt Squier had worn and two lottery tickets in Squier's cluttered room. Smith continued to work the rest of his shift, and at the end of his shift noticed that approximately $95.00 was missing. Smith never returned to work at the Village Pantry because he was afraid that the same thing might happen if he continued to work the night shift. He was unable to find a day-shift position and was unemployed for approximately six weeks. As a result of his unemployment, his car was repossessed.

The State charged Squier with robbery as a Class C felony. At the conclusion of Squier's two-day jury trial, which began on October 1, 2013, the jury found Squier guilty as charged. The trial court sentenced Squier to six years executed with five years served in the Department of Correction and with one year to be served on work release only if Squier committed no violations at the Department of Correction. The trial court also gave Squier credit for forty-seven days served. Squier now appeals.

## DISCUSSION AND DECISION

### I.

Squier claims that there is insufficient evidence to support his conviction of robbery, contending that there is no evidence that he took money from the cash register at the Village Pantry while Smith was working there.

> Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. We will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. A conviction may be based upon circumstantial evidence alone. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense.

*Lainhart v. State*, 916 N.E.2d 924, 939 (Ind. Ct. App. 2009) (internal citations omitted).

In order to prove beyond a reasonable doubt that Squier committed robbery as a Class C felony, the State was required to establish that Squier knowingly or intentionally took property from Smith while putting him in fear. Ind. Code §35-42-5-1(2) (1984). In challenging the sufficiency of the evidence, Squier points to his own testimony at trial in which he acknowledged his presence at the Village Pantry and that he was the individual in the surveillance video, but offered his own version of the events shown on the video tape.

Squier's version of the events was presented to the jury. "It is the function of the trier of fact to 'determine the weight of the evidence and the credibility of the witnesses. The trier of fact is free to believe or disbelieve witnesses, as it sees fit.'" *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996) (quoting *Moore v. State*, 637 N.E.2d 816, 822 (Ind. Ct. App. 1994)). Here, the jury was presented with two versions of the events and chose to discredit Squier's version. Although the cash, which was not unique in any

respect, that was taken from the Village Pantry was not recovered in Squier's cluttered room, reasonable inferences from the evidence can be drawn to support the jury's verdict. Squier's arguments in this regard on appeal is merely a request for us to reweigh the evidence and reassess the credibility of witnesses, a task our standard of review forbids us from undertaking. *Id.*

"If the testimony believed by the jury 'is enough to support the verdict, then the reviewing court should not disturb it.'" *Sherwood v. State*, 784 N.E.2d 946, 952 (Ind. Ct. App. 2003) (quoting *McCarthy v. State*, 749 N.E.2d 528, 538 (Ind. 2001)). The facts set forth above sufficiently support the jury's verdict and we need not restate them here. We decline Squier's request to disturb the jury's verdict.

## II.

Squier also contends that the trial court abused its discretion by imposing a six-year sentence. The sentencing range for a Class C felony is a fixed term of imprisonment between two years and eight years with the advisory sentence being four years. Ind. Code §35-50-2-6 (2005). Our Supreme Court has stated that "sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). A trial court may impose any sentence within the statutorily defined allowable range for a crime without identifying specific aggravating or mitigating circumstances. *Id.* Nonetheless, the trial court must enter a sentencing statement including detailed reasons for the particular sentence imposed. *Id.* at 1223. The reasons a trial court gives for imposing a particular sentence and the omission of any reasons arguably supported by the record are subject to

7

review for an abuse of discretion. *Id*. However, the weight or value given to a reason properly found or reasons that should have been found are not subject to review for an abuse of discretion. *Id*.

Squier appears to claim that the trial court's sentencing statement is inadequately detailed. Yet, Squier sets forth verbatim in his brief eight pages of the trial court's sentencing statement. The crux of his argument on appeal, however, is that the trial court failed to find and/or acknowledge two proffered mitigating circumstances and that improper weight was given to the aggravators and mitigators the trial court found.

Although we cannot review the weight given to the aggravating and mitigating circumstances in the trial court's detailed sentencing statement, we can review whether the trial court abused its discretion by failing to find the proffered mitigating circumstances, namely Squier's remorse and his family support. "Where a defendant alleges that a trial court has failed to find a particular mitigating circumstance, it is the defendant's burden to establish that the mitigating evidence is both significant and clearly supported by the record." *Edsall v. State*, 983 N.E.2d 200, 205 (Ind. Ct. App. 2013). "A trial court is not obligated to accept the defendant's argument as to what constitutes a mitigating factor, and a trial court is not required to give the same weight to proffered mitigating factors as does a defendant." *Id*. at 206.

Here, none of Squier's family members testified at his sentencing hearing. Therefore, to the extent Squier claimed that he had family support, the record shows that his counsel advanced that argument to the trial court, but the mitigator is not clearly supported by evidence in the record. Furthermore, the trial court had already found that

8

Squier's incarceration would present a hardship to his family. The trial court did not abuse its discretion by failing to find this proffered mitigator.

With respect to the proffered mitigator that Squier was remorseful, the record shows that the trial court considered that mitigating circumstance and rejected it, specifically referring to the fact that Squier went home, ate a bowl of cereal, and went to bed immediately after committing the offense. The trial court explicitly refused to consider or hold against Squier his exercise of his right to a jury trial and maintaining his innocence throughout the trial as evidence of a lack of remorse as argued by State. The trial court did not abuse its discretion in its consideration of this factor.

III.

Squier further argues that his six-year sentence is inappropriate in light of the nature of the offense and the character of the offender. Although the trial court may have acted within its lawful discretion in imposing Squier's sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007) (quoting *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007)). The defendant has the burden of persuading us that his sentence is inappropriate. *Id.* (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)).

As for the nature of the offense, the trial court considered the lingering impact the robbery had on Smith. Beyond the evidence required to establish the element that Smith was placed in fear, the trial court considered Smith's testimony that he was unable to return to work after having tried to change to a different shift. Smith was unemployed for six weeks after the robbery and his car was repossessed. Smith feared not only for his own life, but the impact the potential use of a weapon could have on his family, in particular, his young son. The trial court considered that this crime was not the most violent in that a weapon was not used, but that the nature and circumstances surrounding the offense warranted a slightly enhanced sentence. Initially, Smith was ordered to get down on his knees and crawl after taking the money from the register. Squier later allowed him to stand up, but demanded that Smith head to a back room of the store, a place Smith knew was not covered by surveillance cameras. Squier then ordered Smith to lock himself in the bathroom and begin counting to 200. Squier has not met his burden of persuading us that his sentence is inappropriate on this basis.

As for the character of the offender, we note as the trial court did that Squier's criminal history is not the worst. However, his criminal history shows an escalation of criminal activity. Squier, who was twenty-nine years old at the time he committed this offense, had one prior misdemeanor conviction for domestic battery and another conviction for harassment. Squier was convicted of non-support of a dependent a year prior to committing this offense. His criminal history further reflects arrests for conversion, possession of paraphernalia, interference with the reporting of a crime, and harassment. Although Squier had received leniency with respect to his prior offenses, he persisted in

10

committing new offenses. He had violated a pre-trial diversion in the past, and his probation was unsuccessfully terminated the same year that he committed this offense.

Further, Squier offered explanations or excuses for each of his offenses an indication that he has yet to accept responsibility for the consequences of his actions. Squier continues to consume alcohol despite having problems with substance abuse in the past and his need to take medication to treat his medical conditions. Even though he claimed to support two children, he was convicted of non-payment of support owing approximately $27,000 in child support. Squier has not met his burden of establishing that his sentence is inappropriate in light of his character.

## CONCLUSION

In light of the foregoing, we affirm the trial court's decision.

Affirmed.

BAKER, J., and KIRSCH, J., concur.

11