## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 22 2020, 11:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationship of R.S. and J.P. (Minor Children)

and

T.A. (Mother) and J.S. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 22, 2020

Court of Appeals Case No.
19A-JT-1895

Appeal from the Orange Circuit Court

The Honorable Steven L. Owen, Judge

Trial Court Cause Nos.
59C01-1809-JT-179
59C01-1809-JT-183

**Bradford, Chief Judge.**

# Case Summary

[1]     T.A. ("Mother") and J.S. ("Father"), (collectively "Parents"), are the biological parents of R.S. (born July 25, 2014), and Mother is the biological parent of J.P. (born May 14, 2013).[1] In September of 2016, following the death of his father, J.P. was adjudicated to be a child in need of services ("CHINS") due to Mother's substance abuse. In February of 2017, R.S. was adjudicated a CHINS due to Parents' substance abuse. In September of 2018, the Department of Child Services ("DCS") petitioned to terminate Parents' parental rights to R.S. and Mother's parental rights to J.P. On July 1, 2019, the juvenile court ordered that Parents' parental rights to the Children be terminated.[2] Parents contend that the juvenile court's denial of their motions to dismiss and termination of their parental rights was clearly erroneous. We affirm.

---

[1] J.P.'s biological father was his custodial parent until his death in 2016.

[2] R.S. and J.P. will be referred to collectively as the "Children."

# Facts and Procedural History

[2] In July of 2015, DCS became involved with Parents and the Children while investigating a report concerning Parents' substance abuse. In October of 2015, Parents agreed to participate in an informal adjustment program. Parents, however, failed to comply with the terms of the informal adjustment by screening positive for illegal substances. In March of 2016, R.S. was removed from Parents' care, and DCS petitioned to have R.S. adjudicated a CHINS due to Parents' substance abuse and arrests. In July of 2016, J.P. was removed from Mother's care, and DCS petitioned to have J.P. adjudicated a CHINS due to Mother's substance abuse and the death of J.P.'s father. In September of 2016, J.P. was adjudicated a CHINS. In February of 2017, R.S. was adjudicated a CHINS. In July of 2017, the juvenile court held a dispositional hearing, at which it ordered Parents to maintain weekly contact with the family case manager ("FCM"); notify the FCM of any address or telephone number changes; keep all appointments with service providers; maintain suitable and stable housing; refrain from using, consuming, or selling any controlled substances; complete a substance-abuse assessment and follow all recommendations; submit to random drug screens; and attend all visitation.

[3] On September 14, 2018, DCS petitioned for the termination of Parents' parental rights to R.S. and, four days later, petitioned for the termination of Mother's parental rights to J.P. On May 1, 2019, the juvenile court held a factfinding hearing regarding both of DCS's termination petitions ("TPR petitions"). On

July 16, 2019, the juvenile court terminated Parents' parental rights to R.S. In doing so, the juvenile court found as follows:

Services

14. The Court ordered Father and Mother to participate in substance use assessment, substance use treatment, random drug screens, and visitation.

15. DCS offered services to Father, including: individual therapy/home based therapy; substance use assessment at Southern Hills Counseling Center; random drug screens; and supervised visits.

16. DCS offered services to Mother, including: individual therapy; substance use assessment; random drug screens; and supervised visits.

17. Father never demonstrated consistency in attendance in any services.

18. The Court ordered services for Father suspended on October 2, 2018. Father continued to receive services through a companion/sibling case after October 2, 2018.

19. Father failed to attend any substance use treatment until October-November 2018.

20. Carrie Andrews, therapist with LifeSpring [formerly Southern Hills Counseling Center] met with Father in 2016 to complete a substance use assessment, but Father did not follow through with any substance use treatment.

21. Carrie Andrews met again with Father in November 2018 and completed a substance use assessment for Father. At that time, Ms. Andrews recommended that Father participate in (1) Individual Therapy for one (1) hour a week; and (2) Group Therapy for one (1) hour per week.

22. Father attended one (1) Individual Therapy appointment and then canceled the appointment scheduled for November 20, 2018. Father failed to schedule any further appointments.

23. Father attended four (4) Group Therapy sessions, and then Father no showed for remaining sessions. LifeSpring discharged Father from Group Therapy on February 5, 2019 for lack of compliance.

24. Father has not contacted Carrie Andrews to restart Individual Therapy or Group Therapy.

25. Carrie Andrews testified credibly that Father did not show any improvement in addressing his substance use problems from her assessment in 2016 until her assessment in November 2018.

26. Father did not report to Ms. Andrews that he engaged in any substance use program between 2016 and 2018.

27. Ms. Andrew[s] testified credibly that Father did not demonstrate an understanding of his substance use or how to address his substance use problem.

28. DCS requested that Father participate in weekly drug screens. During the pendency of this case, Father repeatedly refused to submit to drug screens for DCS.

29. Father met with Emily Clearwater (IHBS Therapist) for a Substance Use Assessment on October 17, 2018 and October 21, 2018. Ms. Clearwater recommended further substance use treatment for Father, but the Court suspended Father's services before Father engaged in treatment.

30. Father reported to Emily Clearwater (IHBS Therapist) that Father used marijuana in the previous three (3) months.

31. During the pendency of this case, Father failed to contact DCS weekly. [DCS Family Case Manager Karen] Howson would have contact with Father only at Court hearings.

32. During the pendency of this case, [court-appointed special advocate] Robin Brown (CASA) attempted to contact Father, but CASA was not successful in locating and talking to Father.

33. During the pendency of this case, Father failed to regularly attend Court hearings in the CHINS case, and Father failed to appear for the Fact Finding Hearing to address the termination of his parental rights.

34. Father was incarcerated for brief periods during the pendency of this case.

35. Mother never demonstrated consistency in attendance in any services.

36. The Court ordered services for Mother to be suspended on October 2, 2018.

37. During the pendency of this case, Mother failed to maintain weekly contact with DCS.

38. Mother has never maintained stable housing. Mother failed to keep FCM Howson informed of Mother's address. Mother moved frequently and would not notify DCS of her new address or telephone number.

39. During the pendency of this case, Robin Brown (CASA) attempted to contact/visit Mother, but the phone numbers that Mother provided never worked. CASA was not able to locate Mother.

40. Mother completed a substance use assessment at Southern Hills Counseling Center in 2016, but Mother failed to complete substance use treatment.

41. DCS requested that Mother participate in weekly drug screens. During the pendency of this case, Mother refused to submit to drug screens for DCS.

42. In March 2017, Mother was arrested and charged with Possession of Methamphetamine (a Level 6 Felony) in Orange County Superior Court, Case No. 59D01-1703-F6-000269. (DCS Exhibit 5) On May 10, 2017, Mother plead guilty to this charge.

43. While incarcerated at Orange County Jail in February 2018, Mother admitted to using Methamphetamine to FCM Howson.

44. FCM Howson offered services and visits to Mother upon Mother's release from jail in April 2018, but Mother failed to contact FCM Howson to get services or visits established.

45. Mother failed to participate in any substance use treatment during the pendency of this case.

46. During the pendency of this case, Mother failed to regularly attend Court hearings in the CHINS case, and Mother failed to appear for the Fact Finding Hearing to address the termination of her parental rights.

47. At the time of the Fact Finding Hearing, the Orange County Superior Court had issued a warrant for the arrest of [Mother] for probation violations in Cause No. 59D01-1603-F6-000247.

48. Mother's probation violation was based on a failed drug screen.

49. At the time of the Fact Finding Hearing, FCM Howson remains concerned with substance use by Mother and Father, as use of illegal substances affects the parents' ability to properly supervise and care for the child.

Visits

50. DCS offered weekly supervised visits with [R.S] to Mother and Father.

51. During the pendency of this case, Father failed to regularly attend visits with the child.

52. Father's last visit with [R.S.] occurred on October 28, 2017.

53. Father has not contact FCM Howson since October 28, 2017 to request a visit with [R.S.].

54. During the pendency of this case, Mother failed to regularly attend visits with the child.

55. Mother's last visit with [R.S.] occurred on February 26, 2018.

56. FCM Howson offered visits to Mother upon Mother's release from jail in April 2018, but Mother failed to contact FCM Howson to get visits established.

Appellant's App. Vol. II pp. 120–23. That same day, the juvenile court also terminated Mother's parental rights to J.P. and in doing so, found that:

Services

15. At the Dispositional Hearing, the Court ordered Mother to participate in the same services as those ordered for Mother in the sibling/companion case, Cause No. 59C01-1603-000056.

16. DCS offered services to Mother, including: individual therapy; substance use assessment; random drug screens; and supervised visits.

17. Mother never demonstrated consistency in attendance in any services.

18. The Court ordered services for Mother to be suspended on October 2, 2018.

19. During the pendency of this case, Mother failed to maintain weekly contact with DCS.

20. Mother has never maintained stable housing. Mother failed to keep FCM Howson informed of Mother's address. Mother

moved frequently and would not notify DCS of her new address or telephone number.

21. During the pendency of this case, Robin Brown (CASA) attempted to contact/visit Mother, but the phone numbers that Mother provided never worked. CASA was not able to locate Mother.

22. Mother completed a substance use assessment at Southern Hills Counseling Center in 2016, but Mother failed to complete substance use treatment.

23. DCS requested that Mother participate in weekly drug screens. During the pendency of this case, Mother refused to submit to drug screens for DCS.

24. In March 2017, Mother was arrested and charged with Possession of Methamphetamine (a Level 6 Felony) in Orange County Superior Court, Cause No. 59D01-1703-F6-000269. (DCS Exhibit 5) On May 10, 2017, Mother plead guilty to this charge.

25. While incarcerated at Orange County Jail in February 2018, Mother admitted to using Methamphetamine to FCM Howson.

26. FCM Howson offered services and visits to Mother upon Mother's release from jail in April 2018, but Mother failed to contact FCM Howson to get services or visits established.

27. Mother failed to participate in any substance use treatment during the pendency of this case.

28. During the pendency of this case, Mother failed to regularly attend Court hearings in the CHINS case, and Mother failed to appear for the Fact Finding Hearing to address the termination of her parental rights.

29. At the time of the Fact Finding Hearing, the Orange County Superior Court had issued a warrant for the arrest of [Mother] for

probation violations in Cause No. 59D01-1603-F6-000247. (DCS Exhibit 6)

30. Mother's probation violation was based on a failed drug screen.

31. At the time of Fact Finding Hearing, FCM Howson remains concerned with substance use by Mother, as use of illegal substances affects the parents' ability to properly supervise and care for the child.

<u>Visits</u>

32. DCS offered weekly supervised visits with [J.P.] to Mother.

33. During the pendency of this case, Mother failed to regularly attend visits with the child.

34. Mother's last visit with [J.P.] occurred on February 26, 2018.

35. FCM Howson offered visits to Mother upon Mother's release from jail in April 2018, but Mother failed to contact FCM Howson to get visits established.

Appellant's App. Vol. III pp. 84–85.

# Discussion and Decision

## I. Motions to Dismiss

[4] Because the juvenile court failed to hold a factfinding hearing within ninety days after DCS petitioned for the termination of Parents' parental rights pursuant to Indiana Code section 31-35-2-6, Parents contend that the juvenile court erroneously denied their motions to dismiss. A timely hearing on DCS's TPR petitions is required under Indiana law. "Matters of statutory

interpretation present pure questions of law; as such, these questions are reviewed *de novo.*" *Rodriguez v. State*, 129 N.E.3d 789, 793 (Ind. 2019). Indiana Code section 31-35-2-6 provides that

> (a) Except when a hearing is required after June 30, 1999, under section 4.5 of this chapter, the person filing the petition shall request the court to set the petition for a hearing. Whenever a hearing is requested under this chapter, the court shall:
>
>> (1) commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and
>>
>> (2) complete a hearing on the petition not more than one hundred eighty (180) days after a petition is filed under this chapter.
>
> (b) If a hearing is not held within the time set forth in subsection (a), upon filing a motion with the court by a party, the court shall dismiss the petition to terminate the parent-child relationship without prejudice.

[5] DCS filed its TPR petitions in September of 2018, and the factfinding hearing regarding those petitions was ultimately held in May of 2019. This hearing clearly fell outside of the timeframe required under Indiana Code section 31-35-2-6; however, we conclude that Parents invited this error and cannot now seek to use the error to their advantage. Invited error, which is based on the legal principle of estoppel, forbids a party from taking "advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct." *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018) (quoting *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005)). "A party may not invite error, then

later argue that the error supports reversal, because error invited by the complaining party is not reversible error." *Booher v. State*, 773 N.E.2d 814, 823 (Ind. 2002).

[6] While it is true that Mother orally moved to dismiss the TPR petitions at a hearing in February of 2019 and Parents filed motions to dismiss in March of 2019, their actions and omissions, prior and subsequent to those stated above, invited the untimely factfinding hearing.[3] First, on November 14, 2018, the juvenile court held a pretrial conference and set the factfinding hearing for January 25, 2019, a date which fell outside the timeframe required by Indiana Code section 31-35-2-6. There is no indication in the record that Parents objected to the setting of that date. *See Matter of N.C.*, 83 N.E.3d 1265, 1268 (Ind. Ct. App. 2017) ("Having acquiesced to the setting of a fact-finding hearing date outside the statutory parameters, Father has preserved no issue for appellate review regarding the application of Indiana Code Section 31-35-2-6."). Moreover, when the factfinding hearing was rescheduled for March 13, 2019, both Parents requested a continuance. At the hearing on March 13, 2019, Mother's counsel stated, "Well, Your Honor, what I would say is by my asking for a continuance, whatever issue I may have had with an out-of-time TPR, I think I waive that because I'm saying that it's more important to me […] to get

---

[3] We note that in January of 2019, DCS moved to dismiss the TPR petitions based on Indiana Code section 31-35-2-6 and that one was ultimately granted by the juvenile court. The juvenile court, however, vacated its order dismissing the TPR petition, noting that the granting of said motion was a clerical error, and DCS withdrew both of its motions to dismiss the TPR petitions.

my client here than it is to be within the time frame." Tr. Vol. II pp. 33–34. The juvenile court's order granting the continuance and setting the factfinding for May 1, 2019, stated that

> Mother by counsel requests a continuance of the Fact Finding Hearing. Mr. Smith reports that he has not had contact with [Mother] since his appointment as subsequent attorney for the Mother. Mr. Smith agrees that any delay in the Fact Finding Hearing be attributable to the parents as the continuance is requested for their benefit.
>
> Father by counsel requests a continuance of the Fact Finding Hearing. Ms. Fullen reports that she can not confirm that [Father] had notice of the Fact Finding Hearing date. Ms. Fullen agrees that any delay in the Fact Finding Hearing be attributable to the parents as the continuance is requested for their benefit.

Appellant's App. Vol. II p. 75. By acquiescing to an untimely factfinding hearing date in November of 2018 and acknowledging that they were forfeiting any objection to the untimeliness by seeking a continuance in March of 2019, Parents invited any error that occurred under Indiana Code section 31-35-6-2.

## II. Termination of Parental Rights

[7] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "Though it's been oft-stated, it bears repeating: the parent–child relationship is one of the most valued relationships in our culture." *Matter of M.I.*, 127 N.E.3d 1168, 1170–71 (Ind. 2019) (internal quotations and citations omitted). Parental rights,

however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate the parent–child relationship. *Bester*, 839 N.E.2d at 147. Therefore, when parents are unwilling or unable to fulfill their parental responsibilities their rights may be terminated. *Id.*

[8] In reviewing the termination of parental rights on appeal, we neither reweigh the evidence nor judge the credibility of witnesses. *Doe v. Daviess Cty. Div. of Children & Family Servs.*, 669 N.E.2d 192, 194 (Ind. Ct. App. 1996), *trans. denied*. We consider only the evidence and reasonable inferences therefrom which are most favorable to the juvenile court's judgment. *Id.* Where, as here, a juvenile court has entered findings of facts and conclusions of law, our standard of review is two-tiered. *Id.* First, we determine whether the evidence supports the factual findings, second, whether the factual findings support the judgment. *Id.* The juvenile court's findings and judgment will only be set aside if found to be clearly erroneous. *Id.* A finding is clearly erroneous if no facts or inferences drawn therefrom support it. *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005). "A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment."

*Id.* When the juvenile court's findings are unchallenged on appeal, we accept them as true. *See In re S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019).[4]

[9]     Indiana Code section 31-35-2-4(b) dictates what DCS is required to establish to support a termination of parental rights. Of relevance to this case, DCS was required to establish by clear and convincing evidence

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]
> >
> > [and]
>
> (C) that termination is in the best interests of the child[.]

---

[4] Parents challenge only the juvenile court's finding that "[a]t the time of Fact Finding Hearing, FCM Howson remains concerned with substance use by Mother, as use of illegal substances affects the parents' ability to properly supervise and care for the child." Appellant's App. Vol. III p. 85. FCM Howson, however, testified to her concerns with Mother's substance abuse, which the juvenile court was entitled to believe and did. We will not second-guess the juvenile court's determination of FCM Howson's credibility.

Ind. Code § 31-35-2-4(b)(2).[5] In challenging the sufficiency of the evidence to sustain the termination of their parental rights, Parents contend that the juvenile court erred by concluding that (1) there is a reasonable probability that the conditions that resulted in the Children's removal would not be remedied and (2) termination of their parental rights was in the Children's best interests.

## A. Indiana Code Section 31-35-2-4(b)(2)(B)

[10] Parents contend that there is insufficient evidence to establish a reasonable probability that the conditions that resulted in the Children's removal would not be remedied.

> In determining whether the conditions that resulted in the child[ren]'s removal…will not be remedied, we engage in a two-step analysis[.] First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions

---

[5] It is not disputed that the Children had been removed from Parents for at least six months under a dispositional decree and that there was a satisfactory plan for the care and treatment of the Children, both required findings pursuant to Indiana Code section 31-35-2-4(b)(2).

does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642–43 (Ind. 2014) (cleaned up).

[11] Here, the condition that led to the Children's removal were allegations of Parents' substance abuse. Since DCS became involved in 2015, Parents have failed to successfully complete any recommended or court-ordered services, including substance-abuse treatment or therapy, which ultimately led to their services being suspended by the juvenile court in October of 2018. Parents have repeatedly refused to participate in drug screening. Father admitted to using marijuana, and Mother admitted to using methamphetamine. Moreover, both Parents have spent time incarcerated during this matter. In May of 2017, Mother pled guilty to Level 6 felony methamphetamine possession and later violated the terms of her probation by failing a drug screen. Finally, at the time of the factfinding hearing, FCM Howson still remained concerned with Parents' substance abuse. The record is devoid of any evidence that would indicate that Parents will remedy their substance-abuse issues.

[12] Parents seem to argue that the juvenile court erroneously focused on their historical failures rather than their capacity to parent the Children at the time of the factfinding hearing, citing Mother's suitable housing and the Children's happiness. This argument, however, fails for multiple reasons. First, the juvenile court was well within its discretion to weigh Parents' historical failures more heavily than their efforts made shortly before the termination hearing, finding this past behavior to be the best predictor of Parents' future behavior. *In*

*re E.M.,* 4 N.E.3d at 643. Second, Mother's current housing situation, even if we assume that it is, in fact, suitable, does not demonstrate that Parents have addressed their substance abuse issues, which was the condition that lead to removal. Finally, it seems to us that any happiness and well-being the Children are currently enjoying can only be attributed to the care they have received from their foster parents. The juvenile court did not abuse its discretion by concluding that the conditions that led to the Children's removal would not be remedied.

## B. Indiana Code Section 31-35-2-4(b)(2)(C)

[13] Parents contend that there is insufficient evidence to support the juvenile court's conclusion that termination of their parental rights was in the Children's best interests. We are mindful that, in determining what is in the best interests of a child, the juvenile court must look beyond factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court need not wait until a child is irreversibly harmed before terminating the parent–child relationship because it must subordinate the interests of the parents to those of the children. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). We have often held that recommendations from the FCM and CASA to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, is sufficient evidence to show that termination is in the child's best interests. *In re J.S.*, 906 N.E.2d at 236.

[14] Both FCM Howson and CASA Brown testified that they believed adoption was in the Children's best interests. While coupling that testimony with our previous conclusion that there was sufficient evidence to show that the conditions of removal would not be remedied is sufficient to support the juvenile court's termination of Parents' parental rights, it is not as though this testimony is unsupported by other evidence in the record.

[15] In addition to their inability to address their substance abuse issues, Parents failed to successfully complete any of the DCS-recommended or court-ordered services. Parents also spent time incarcerated throughout this matter. Moreover, Parents failed to consistently attend visitation with the Children, with Father's last visitation occurring in October of 2017 and Mother's in February of 2018. Parents also failed to attend the factfinding hearing regarding the termination of their parental rights. Last, the Children no longer have a connection with Parents given the lapse of time since they last saw each other and are doing well in their foster placements. Considering the totality of the evidence, Parents have failed to establish that the juvenile court's determination that termination was in the Children's best interests was clearly erroneous.

[16] The juvenile court's judgment is affirmed.

Baker, J., and Pyle, J., concur.